306 Ga. 216
FINAL COPY

S19A0042.  VASQUEZ v. THE STATE.

BETHEL, Justice.

Christian Vasquez appeals from the denial of his motion for new trial after a jury found him guilty of malice murder, two counts of felony murder, aggravated assault, two counts of cruelty to children in the first degree, and concealing the death of another in connection with the death of his two-year-old daughter, Prisi Vasquez.[1] He argues that the State failed to present sufficient

---

[1] Vasquez was indicted jointly with Amy Ruiz by a Gwinnett County grand jury on June 3, 2015.  Vasquez was indicted for malice murder, two counts of felony murder, aggravated assault, two counts of cruelty to children in the first degree, and concealing the death of another. Ruiz was charged jointly with Vasquez on one count of felony murder, and she was charged with separate counts of cruelty to children in the first degree and concealing the death of another. On July 2, 2015, Vasquez moved to sever the parties, and the trial court granted that motion. In a separate proceeding, Ruiz was tried and convicted of involuntary manslaughter, cruelty to children in the first degree, and concealing the death of another. Her case is not addressed in this appeal. Following a jury trial held in December 2016, Vasquez was convicted on all charged counts. The felony murder counts were vacated by operation of law, and the trial court sentenced Vasquez to serve life in prison for malice murder, twenty

evidence to support his conviction for cruelty to children in the first degree predicated on his failure to seek timely medical care for the victim. He also argues that there was insufficient evidence to support his conviction for concealing the death of another because the State did not prove that the applicable statute of limitation was tolled. Vasquez also argues that the trial court committed plain error by giving erroneous jury instructions regarding the statute of limitation applicable to the offense of concealing the death of another and the manner in which the statute of limitation could be tolled. He further argues that the trial court committed plain error when it failed to instruct the jury regarding corroboration of

---

years consecutive for aggravated assault, twenty years consecutive for cruelty to children in the first degree, and ten years consecutive for concealing the death of another. Vasquez filed a motion for new trial on December 21, 2016, and he subsequently amended the motion twice. The trial court held a hearing on the motion on February 23, 2018, and it denied the amended motion in an order dated May 15, 2018. In that order, the trial court found that the aggravated assault conviction should have merged with the malice murder conviction, and it amended Vasquez's sentence accordingly. Vasquez filed a notice of appeal on May 29, 2018. This case was docketed to the Court's term beginning in December 2018 and submitted for a decision on the briefs.

accomplice testimony. Additionally, Vasquez argues that he received ineffective assistance from his trial counsel based on his counsel's failure to object to the admission of evidence regarding prior acts of child abuse committed by Vasquez and because his counsel did not object to the trial court's instruction regarding the statute of limitation for concealing the death of another. Finally, Vasquez argues that his convictions for cruelty to children in the first degree should have merged with his conviction for malice murder. Finding no reversible error, we affirm.

1. Viewed in the light most favorable to the jury's verdict, the evidence adduced at trial shows as follows. In February 2007, Christian Vasquez and Amy Ruiz were married[2] and lived in a rented house in Gwinnett County with their two-year-old daughter, Prisi, and Ruiz's three-year-old son, J. E. In October 2006, Prisi and J. E. had been removed from the custody of Vasquez and Ruiz and placed in the custody of Ruiz's father pursuant to a juvenile court

---

[2] Vasquez and Ruiz divorced approximately three years before Vasquez's trial.

3

order following allegations that Vasquez and Ruiz abused J. E.[3]

Ruiz's father had facilitated opportunities for Ruiz to be with the children, including allowing Vasquez, Ruiz, and the children to live with him before they began renting the house in Gwinnett County. The children were still in the legal custody of Ruiz's father in February 2007.

Ruiz left their home at 7:30 on the morning of February 3 to babysit the daughter of her sister, Erica Arroyo.[4] Vasquez stayed

---

[3] At trial, Vasquez elicited testimony from Ruiz on cross-examination regarding a June 23, 2008 interview Ruiz gave to a police detective from Gwinnett County. In that interview, Ruiz described a prior incident in which J. E. had been hurt while he was with Vasquez's family. She told the detective that, when J. E. was hurt, she went straight to the hospital. There, the police took J. E. from Ruiz's custody. She told the detective in the interview that she was "scared they were going to say I'm the one that did this to my son. It was my fault." Ruiz was charged with child abuse arising from that incident, but that charge was later dismissed. Vasquez elicited testimony from Ruiz's sister, Erica Arroyo, on cross-examination that, a couple of days prior to the incident in which Prisi was killed, Arroyo had gone to Ruiz's house. Vasquez was not home at the time. Upon arriving at the home, Arroyo found Prisi locked in the bathroom with the lights off. Prisi was crying, and she had a black eye. When Arroyo confronted Ruiz about this, Ruiz told her Prisi "won't listen to me. I need to teach her to be potty trained."

[4] Arroyo testified that this was the first time Ruiz had ever done this, as, prior to February 3, Arroyo would always drop off her daughter at Ruiz's house for babysitting. Arroyo testified that, when Ruiz arrived at her house, Ruiz told her she had just left Walmart and was already in the area. Arroyo testified that Ruiz was upset when she arrived at Arroyo's house.

home with J. E. and Prisi. Ruiz testified that Prisi was "completely okay" and in good health when Ruiz left home that morning.

At 9:36 a.m., Vasquez called Ruiz at Arroyo's house and asked her to come home because Prisi was sick.[5] Ruiz told Arroyo, "I've got to go," and took Arroyo's daughter with her. Ruiz did not return to her house immediately, and she would later testify that Vasquez called her several times that morning.[6] Ruiz ran several errands before returning home between 5:00 and 6:30 that evening.[7]

When Ruiz arrived home, Prisi was lying on the couch next to Vasquez and J. E. Vasquez was telling Prisi to wake up, but she did not respond. Ruiz went over to try to talk to Prisi and observed that she could make noises with her mouth but was unable to form words,

---

[5] Arroyo testified that Ruiz received this call shortly after arriving at her house. Arroyo testified that she could hear children crying in the background on the call. Ruiz did not indicate to Arroyo that anything was wrong after hanging up the phone.

[6] Phone records introduced by Vasquez show only one call placed from Vasquez's cell phone to Ruiz's cell phone on February 3, 2007. That call was placed at 9:36 a.m. and lasted less than one minute. Arroyo testified that Ruiz received only one phone call while Ruiz was at Arroyo's house on the morning of February 3.

[7] At some point that evening, Arroyo's husband picked up their daughter from the Vasquez/Ruiz house. Arroyo testified that Ruiz was waiting outside with Arroyo's daughter when her husband arrived at the house.

did not respond to Ruiz, and did not move. Prisi then stopped breathing.

Ruiz asked Vasquez, "What did [you] do to my daughter?" Vasquez told her to "shut up" and that "he needed time." Vasquez took Ruiz's keys and phone and then took Prisi away from Ruiz and went into the bedroom, barring Ruiz from coming into the room. He then stuffed Prisi's unclothed body into a trash bag and hid her in the attic through an entrance in the bedroom closet. Around 11:00 that night, Ruiz called Arroyo and left a voicemail in which she said, "Call me back. Something happened. Call me back." Arroyo called Ruiz back later that night, but Ruiz did not answer.

The next morning, Sunday, February 4, Arroyo again called Ruiz. This time, Ruiz answered and asked for $100 in cash from Arroyo. Ruiz told Arroyo she needed the money to pay her electric bill, but she would later testify that she sought the money so that Vasquez could flee. Arroyo gave Ruiz the money she requested. That day, Ruiz also obtained a check from Vasquez's employer (Ruiz's uncle) for $110 and cashed it. Ruiz testified that Vasquez threatened

6

to kill J. E. if she did not get money for him. Vasquez used the money to purchase bus tickets to Mexico. Ruiz, Vasquez, and J. E. then took a bus to Mexico that day.

Ruiz did not inform Arroyo or any other members of her family that she and Vasquez were leaving, and her family became concerned when they were unable to contact her. Arroyo and other members of Ruiz's family went to her house on Tuesday, February 6. Upon entering the house, they observed food on the table, Prisi's car seat sitting in the living room, clothing strewn about the house, and a series of black bags left out in the house, which they found unusual because Ruiz normally kept a clean house. They also noticed an article of Prisi's clothing with a wet stain on it. Ruiz's family filed a missing person report that day concerning Vasquez, Ruiz, and the children, and Gwinnett County police responded to the home to investigate. Police entered the home, interviewed Ruiz's family members who were present, and took photographs of the home's living area and bedrooms. They also noticed a bottle of hydrogen peroxide and a bottle of children's Tylenol on the living

room coffee table and an open bottle of rubbing alcohol in one of the bedrooms. A detective would later testify that it appeared someone had left the house "in a hurry." At that time, the police were not aware there was an access point to the attic in the home, and the police never attempted to enter the attic. Prisi's body was not discovered by the police that day.

On February 5, 2007, the owner of the home came to collect rent. No one answered the door at the house. Two weeks later, having had no correspondence with Ruiz after trying to contact her, he went inside the house. He noticed that numerous items of clothing, furniture, and other personal belongings were in the house. At the end of February 2007, still having had no contact with Ruiz, the landlord cleaned out the house and rented it to new tenants. During this process, he did not go into the attic.

The new tenants later moved out, and the landlord decided to move into the house himself while making some upgrades and repairs. While living there, he noticed a foul odor in the house that he could not remove. He hired someone to help him with the smell,

8

and that person thought the smell might be coming from a dead rodent. He also noticed a small stain on the ceiling between the living room and the kitchen.

In June 2007, Ruiz called Arroyo. She told Arroyo that she was in Mexico with Vasquez, J. E., and Prisi. Ruiz told Arroyo that she had cancer and that she had gone to Mexico for treatment. Arroyo questioned this, but offered to send a box of Prisi's clothes to Ruiz. Ruiz declined the offer, telling Arroyo that Vasquez's mother bought Prisi "anything she wants." Ruiz told Arroyo that the kids were doing well, that they were at the beach, and that everyone was having a great time.

Arroyo also spoke to Ruiz by telephone in July 2007. During that call, Ruiz told Arroyo that she needed a passport and that she planned to leave Prisi in Mexico and return to the United States with J. E. Ruiz explained that she was not bringing Prisi because she would not listen to Ruiz.

Some time in mid-2008, Ruiz admitted to her father during a phone call that Prisi was dead and that her body was hidden in the

attic of the Gwinnett County house.[8] On June 20, 2008, her father and Arroyo went to the Gwinnett County police department to report what Ruiz had told him to a detective. Arroyo told the detective about her contact with Ruiz the day Prisi was killed, her efforts to contact Ruiz the following week, and the call she had with Ruiz in the summer of 2007.

After this discussion, the detective went to the house and spoke with the landlord, informing him that he had reason to believe a homicide had occurred in the house. The landlord allowed the detective to enter the house, and, upon entering, the detective immediately recognized the smell of decaying flesh. Upon a search of the attic, the detective found Prisi's remains. Her body had been wrapped in four black garbage bags, hidden behind a joist in the attic, and covered by insulation. The detective contacted employees from the Gwinnett County Medical Examiner's Office, who came to the house. The detective and personnel from the medical examiner's

---

[8] Arroyo also spoke with police after Ruiz admitted to her and their father that Prisi was dead. Among other things, Arroyo told police that Ruiz had "always been a liar."

office removed the body from the attic.

That day, Prisi's body was transported to the medical examiner's office for autopsy. The medical examiner established that the body was that of a young child between two and three years old. In addition to noting that the body was partially skeletonized and markedly decomposed, the medical examiner determined that the skull was fractured. The fracture, to the back left side of the skull, was a radiating fracture caused by a blunt impact. The fracture also included a displaced piece of bone, which the examiner determined would take "a significant force to break." The medical examiner testified that skull trauma could result from a household accident but that the characteristics of the fracture as well as the fact that the body was concealed in plastic bags and hidden in the attic argued against a finding of accidental death. The examiner determined that the impact likely resulted in injury to the brain and trauma to the spinal cord and brain stem. The medical examiner testified that these injuries could be consistent with non-responsiveness in the extremities and an inability to respond when

11

called by name. The medical examiner determined that the cause of death was blunt-force head trauma and that the manner of death was homicide.

On June 20, 2008, after the detective found Prisi's remains in the attic of the house, Ruiz's father called Ruiz. The call was recorded by law enforcement, and, in that call, Ruiz stated again that Prisi had been left in the attic on February 3, 2007. Ruiz told her father that she wanted to call 911 when she discovered that Prisi was injured but that "[t]hey weren't going to believe me. They were going to put me in jail. And they were going to take [J. E.] away from me. And also, I was going to get you guys into worse problems, and I didn't want my siblings to suffer."

On June 23, 2008, the detective spoke to Ruiz by phone. In that call, Ruiz stated that Vasquez had wrapped Prisi's body in garbage bags and placed her in the attic. She also indicated that she was in Mexico with J. E., but not Vasquez. Ruiz told the detective that she and Vasquez had borrowed money from her sister and taken a bus to Mexico. Following the call, the detective took out charges against

Vasquez and Ruiz for the death of Prisi. The detective was not aware of Vasquez's whereabouts at that time. On June 25, 2008, Ruiz's father contacted the detective to report that Ruiz had relayed to him that J. E. had told her that Vasquez hit Prisi in the head with a tube.

In the summer of 2008, Arroyo traveled to Mexico so that she could bring J. E. back to the United States. Arroyo did not speak with Ruiz while she was in Mexico, and she picked up J. E. from other family members. J. E. returned to Gwinnett County with Arroyo and lived with her following a placement by the Gwinnett County Division of Family and Children Services (DFCS). On three occasions, J. E. told Arroyo that "he hit her — he hit her in the head" with "a tube." Arroyo described J. E. as being "upset" when he told her this and that he told Arroyo that he was "scared and really afraid." Arroyo testified that J. E. also acted scared around male members of her family. Arroyo began taking J. E. to therapy after these outbursts.

On August 29, 2008, J. E. underwent psychological testing requested by Gwinnett County DFCS. The psychologist

13

administered a "children perception test," in which photographs are shown to the subject and the subject is prompted to express feelings and thoughts about what is shown in the photos. The psychologist testified that such photos might include, for example, a "typical family scene," a child riding a bike down a street, or an adult reading a book to a child. In that interview, J. E. responded spontaneously to one photograph by saying "this is the daughter, these are her parents, and the man kill [sic] the daughter with a pipe." As to a different photograph, J. E. stated, "He kill [sic] her, she's dead." The psychologist who performed the interview testified that J. E. became "super stressed and anxious" as he gave these responses and that these manifestations were triggered by every photograph which showed a male figure. J. E. then began pacing around the interview room, curled into a fetal position on the floor, and asked to stop. The psychologist was unable to finish the interview. The psychologist testified at trial that there was no evidence J. E. had been coached.

J. E. was also treated by a therapist eight to ten times between February and August 2009. Arroyo told the therapist that J. E. had

14

witnessed the murder of his little sister. As part of the therapy, the therapist introduced J. E. to a playhouse that had figurines of a generic father, mother, and three children. During one session, J. E. was playing with the figurines and knocked the father figure off the roof of the playhouse. While playing, he told the therapist that "his daddy had hurt his little sister." In another instance, J. E. described himself and his sister as "crying and screaming." He then said that his sister's crying and screaming "suddenly stopped."

Ruiz returned to the United States on September 9, 2009. She turned herself in to law enforcement at the Texas-Mexico border on charges relating to Prisi's death. She was transferred to Gwinnett County on October 5, 2009, where she was booked into jail. While there, she executed an affidavit in support of Vasquez's extradition from Mexico. The parties stipulated that Vasquez was extradited from Mexico and booked into jail in Gwinnett County on January 17, 2013.

(a) *Sufficiency of Evidence as to Child Cruelty Count*.

Vasquez contends that the evidence presented by the State was

15

insufficient to support his conviction for child cruelty in the first degree predicated on his failure to seek timely medical care for Prisi. We disagree.

OCGA § 16-5-70 (b) provides that a "person commits the offense of cruelty to children in the first degree when such person maliciously causes a child under the age of 18 cruel or excessive physical or mental pain." In this case, Count 6 of the indictment alleged that Vasquez committed this offense by failing to seek medical care for Prisi in a timely manner despite her being in obvious need of such aid.

As we have previously discussed:

> For purposes of this Code section, malice in the legal sense[ ] imports the absence of all elements of justification or excuse and the presence of an actual intent to cause the particular harm produced, or the wanton and [willful] doing of an act with an awareness of a plain and strong likelihood that such harm may result. Intention may be manifest by the circumstances connected with the perpetration of the offense. Intent is a question of fact to be determined upon consideration of words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted.

(Citations and punctuation omitted.) *Brewton v. State*, 266 Ga. 160,

161 (2) (465 SE2d 668) (1996). We have further noted that "[m]alice, as an element of the crime of cruelty to children, can be shown by intentionally and unjustifiably delaying necessary medical attention for a child, as that delay may cause the child to suffer from cruel and excessive physical pain." (Citation and punctuation omitted.) *Delacruz v. State*, 280 Ga. 392, 396 (3) (627 SE2d 579) (2006). With regard to the crime of cruelty to children, "criminal intent may be inferred from conduct before, during and after the commission of the crime." *Johnson v. State*, 269 Ga. 632, 634 (501 SE2d 815) (1998).

Here, the State presented evidence that Prisi was two years old at the time of this incident. The testimony established that Vasquez hit Prisi over the head with a "tube." This blow caused a fracture to Prisi's skull, ultimately resulting in her death. Ruiz testified that Vasquez then told her over a phone call that Prisi was "sick." When Ruiz returned to the couple's home, she found Prisi alive but unresponsive, and Prisi later stopped breathing. Instead of seeking medical care or reporting Prisi's injury to any authority, Vasquez moved Prisi to the bedroom, placed her body in the attic, pressured

17

Ruiz to obtain money for bus tickets, and fled the country. This evidence was sufficient to support Vasquez's conviction for cruelty to children in the first degree under Count 6 of the indictment.

(b) *Sufficiency of Evidence of Tolling of Statute of Limitation for Concealing the Death of Another*.

Although Vasquez does not challenge the sufficiency of the evidence presented by the State as to the elements of the crime of concealing the death of another, he argues that the State failed to present sufficient evidence that the statute of limitation for that offense was tolled. He also argues that the statute of limitation applicable to the offense of concealing the death of another is four years because OCGA § 17-3-1 (c), which increases the statute of limitation to seven years for any felony offense committed against a victim who is under 18 years of age at the time of the offense,[9] does

---

[9] OCGA § 17-3-1 (c) provides, in relevant part:
[P]rosecution for felonies [including concealment of the death of another] shall be commenced within four years after the commission of the crime, provided that prosecution for felonies committed against victims who are at the time of the commission of the offense under the age of 18 years shall be commenced within seven years after the commission of the crime.

18

not apply to the offense of concealing the death of another. He argues that the concealment offense has no victim but is instead an offense against public order.

Pretermitting whether OCGA § 17-3-1 (c) increases the statute of limitation for concealing the death of another to seven years in this case, the State presented sufficient evidence to authorize the jury to determine that the statute of limitation was tolled from February 4, 2007 until January 17, 2013. In criminal cases, the statute of limitation normally runs from the time the criminal act is committed to the time of indictment. *Jenkins v. State*, 278 Ga. 598, 601 (1) (a) (604 SE2d 789) (2004). However, OCGA § 17-3-2 (1) provides, in relevant part, that "[t]he period within which a prosecution must be commenced under Code Section 17-3-1 . . . does not include any period in which [t]he accused is not usually and publicly a resident within this state[.]" We have previously determined that this language has the same meaning as former Code Ann. § 27-601, which provided that "[i]f the offender shall abscond from this State, or so conceal himself that he cannot be

19

arrested, such time during which he has been absent from the State, or concealed, shall not be computed or constitute any part of said several limitations." See *Danuel v. State*, 262 Ga. 349, 351 (2) (418 SE2d 45) (1992). As we noted in *Danuel*, "abscond" may be defined as

> [t]o go in a clandestine manner out of the jurisdiction of the courts, or to lie concealed, in order to avoid their process. To hide, conceal, or absent oneself clandestinely, with the intent to avoid legal process. Postponing limitations. Fleeing from arresting or prosecuting officers of this state.

(Citation omitted.) *Danuel*, 262 Ga. at 352 (3).

Here, the evidence established that Vasquez concealed Prisi's death on February 3, 2007, by wrapping Prisi's body in trash bags and placing it in the attic. Vasquez (along with Ruiz and J. E.) boarded a bus in Gwinnett County on February 4, 2007, that was bound for Mexico. After turning herself in to law enforcement at the Texas-Mexico border in September 2009, Ruiz returned to Gwinnett County on October 5, 2009, where she was arrested. While there, she executed an affidavit in support of Vasquez's extradition from

Mexico. Vasquez was extradited from Mexico and booked into jail in Gwinnett County on January 17, 2013. Vasquez was indicted on June 3, 2015.

The evidence recounted above authorized the jury to determine that Vasquez had absconded and that the statute of limitation was tolled from February 4, 2007, until January 17, 2013. The evidence established both the date on which Vasquez left Georgia (February 4, 2007) and the date he was returned by compulsory legal process (January 17, 2013). The evidence allowed the jury to infer that he remained outside of Georgia for the entire period between those dates and that he did so for the purpose of "conceal[ing] himself [so] that he [could not] be arrested." (Citation, punctuation and emphasis omitted.) *Danuel*, 262 Ga. at 352 (2). Consequently, the jury was authorized to find that the statute of limitation on the offense of concealment of the death of another did not begin to run until January 17, 2013. As Vasquez was indicted on June 3, 2015, less than two-and-a-half years later, the jury was authorized to find that prosecution of this offense was not barred by either a four-year

or seven-year statute of limitation.

(c) *Sufficiency of Evidence Presented on Remaining Convictions*.

Vasquez does not challenge the legal sufficiency of the evidence supporting his additional convictions. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the record and conclude that the evidence presented at trial and as summarized above was sufficient to authorize a rational jury to find Vasquez guilty beyond a reasonable doubt of each of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. *Claims of Plain Error in Jury Instructions*.

Vasquez argues that the trial court erred in three ways with respect to the instructions it gave to the jury. As Vasquez made no objection to the jury charge as given by the trial court, we review the jury charge for plain error.[10]

---

[10] OCGA § 17-8-58 (a) provides in relevant part that "[a]ny party who objects to any portion of the charge to the jury or the failure to charge the jury shall inform the court of the specific objection and the grounds for such

22

In the context of jury instruction errors, plain errors are evaluated on appeal under the following four-part test:

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

(Citation and punctuation omitted.) *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011).

---

objection before the jury retires to deliberate." OCGA § 17-8-58 (b) further provides that a failure to object as specified in subsection (a) "preclude[s] appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties. . . ."

(a) *Jury Instruction Regarding Statute of Limitation Applicable to Concealing the Death of Another*.

Vasquez argues that the trial court plainly erred by instructing the jury that the statute of limitation applicable to the offense of concealing the death of another was seven years instead of four years. Pretermitting whether this instruction was erroneous, Vasquez cannot show that the failure to instruct the jury as to a four-year statute of limitation affected the outcome of his trial. As we noted in Division 1 (b), the evidence presented by the State established that the statute of limitation was tolled from February 4, 2007, until January 17, 2013, and that Vasquez was indicted on June 3, 2015. The time that elapsed between the end of the tolling period and the date of the indictment was just over two-and-a-half years. Thus, regardless of whether a four-year or seven-year statute of limitation applied to the offense, the only evidence presented in the case regarding tolling showed that Vasquez was indicted for the offense of concealing the death of another within the limitation period, regardless of which one applied. Vasquez has not

demonstrated any reasonable probability that the trial court's instruction affected the outcome of the case. Thus, we find no plain error.

(b) *Jury Instruction Regarding Manner of Tolling of Statute of Limitation.*

Vasquez also argues that the trial court plainly erred by erroneously instructing the jury as to the manner by which the statute of limitation could be tolled in this case. In its charge to the jury, the trial court instructed the jury that, as to the statute of limitation applicable to the non-murder counts of the indictment, the jury should "exclude from [its] calculation any period of time during which the evidence shows that . . . the defendant was not usually and publicly a resident within this state; *[t]he person committing the crime is unknown* or the crime is unknown" (emphasis supplied). Vasquez argues that this instruction was erroneous because the indictment alleged only that the statute of limitation was tolled for the periods during which the crime was unknown and in which Vasquez was not usually and publicly a

resident of Georgia. He argues that the trial court's charge expanded the indictment by allowing the jury to find that the statute of limitation was tolled in a manner not alleged by the State.[11]

On appeal, we must review the jury charges as a whole. *Scott v. State*, 302 Ga. 29, 31 (2) (805 SE2d 40) (2017). In this case, we find no plain error in the instruction given. Taken as a whole, it is unlikely the jury would have understood that its verdict could be based on something other than the evidence of tolling that had been presented by the State. *Young v. State*, 305 Ga. 92, 96 (4) (823 SE2d 774) (2019). Significantly, the State presented no evidence or argument suggesting that there was any period in which Vasquez was unknown to the State after Prisi's death was discovered. Prisi's death remained unknown to the State until June 2008, when Ruiz's

---

[11] The State, through the Attorney General, notes that "[i]t is not usually cause for a new trial that an entire Code section is given even though a part of the charge may be inapplicable under the facts in evidence," citing *Lee v. State*, 265 Ga. 112, 113 (2) (a) (454 SE2d 761) (1995). But *Lee* involved a situation in which an overbroad instruction may have worked to the defendant's benefit, as the jury was instructed as to four theories of justification under OCGA § 16-3-21, rather than the two that were implicated by the evidence. *Lee*, 265 Ga. at 113-114 (2) (a). Because, in this case, the inclusive instruction arguably worked to the defendant's detriment, our analysis in *Lee* is inapplicable.

father gave information to the police about what he had learned from Ruiz and the police subsequently found Prisi's body in the attic. But that day, the police learned from Ruiz's father that Ruiz had implicated Vasquez in Prisi's death. As noted above, the evidence further established that Vasquez had fled to Mexico and was outside Georgia from February 4, 2007, until his extradition on January 17, 2013. Thus, there was no period of time between the commission of the crime and January 17, 2013, that required Vasquez to be unknown to the State in order for the statute of limitation to be tolled.

Moreover, the record reflects that the trial court read the indictment to the jury and provided the indictment to the jury during its deliberations. The indictment included the State's tolling allegations. The trial court also instructed the jury regarding the State's burden to prove the essential elements of each offense and every material allegation of the indictment beyond a reasonable doubt and the jury's duty to acquit if it found that the State did not prove guilt beyond a reasonable doubt. Under such circumstances,

27

Vasquez cannot show any harm from the trial court's instruction. *Faulks v. State*, 296 Ga. 38, 39 (2) (764 SE2d 846) (2014). This enumeration therefore fails.

(c) *Failure to Instruct Jury as to Corroboration of Accomplice Testimony*.

Vasquez argues that the trial court plainly erred by failing to instruct the jury regarding the need to corroborate the testimony of an accomplice. We disagree.

In its charge to the jury, the trial court stated that "[t]he testimony of a single witness, if believed, is sufficient to establish a fact. Generally there is no legal requirement of corroboration of a witness provided you find the evidence to be sufficient." Vasquez did not object to this charge, and he did not request that an instruction on accomplice corroboration be included in the trial court's charge to the jury.

OCGA § 24-14-8 provides, in relevant part:

> The testimony of a single witness is generally sufficient to establish a fact. However, in . . . felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless,

corroborating circumstances may dispense with the necessity for the testimony of a second witness[.]

The single-witness rule is the general rule and is a guiding principle of both the factfinder's role in evaluating the evidence presented at trial and the courts' role in determining whether the State has presented sufficient evidence to support the charges against a defendant. In most cases, the rule allows the jury to find the defendant guilty in the face of conflicting or inconsistent evidence or on the basis of the uncorroborated testimony of a single witness. See *Handley v. State*, 289 Ga. 786, 786-787 (1) (716 SE2d 176) (2011) (construing former OCGA § 24-4-8). This rule is longstanding, having been in statute in Georgia in some form at least as far back as 1871. See *Parsons v. State*, 43 Ga. 197 (1871) (construing former Code § 3702). For at least that long, this Court has described the accomplice-corroboration rule as an exception to this general principle. See id.; *Childers v. State*, 52 Ga. 106, 106 (1874) (construing former Code § 3755 and noting that the statute "sets out with the statement that ordinarily one witness is sufficient

29

to establish a fact. It then declares there are exceptions to this rule.").

Here, the record shows that many of the State's witnesses, including law enforcement personnel and experts, were not accomplices of Vasquez. Thus, because a single-witness instruction would have been proper as to their testimony, there was no error in the trial court's instruction on the single-witness rule.

However, there was also evidence to support a finding that Ruiz was an accomplice of Vasquez, particularly in the failure of both individuals to seek medical care for Prisi or report her injuries and subsequent death to authorities and in their joint efforts to leave their home and flee to Mexico. Such evidence is clearly the type of evidence our courts view as supporting the finding that one is an accomplice. See, e.g., *Jones v. State*, 268 Ga. 12, 14 (1) (483 SE2d 871) (1997) (witness's presence at crime and subsequent flight can support finding that witness was an accomplice); *Jones v. State*, 242 Ga. 893, 893-894 (1) (252 SE2d 394) (1979) (witness's presence, companionship, and conduct after the crime are circumstances from

which her intent to participate in a criminal act can be inferred). Given this evidence, it was clear and obvious error for the trial court not to instruct the jury as to the corroboration requirements of OCGA § 24-14-8 so that it could properly evaluate Ruiz's testimony and the need to have it corroborated by other witnesses or evidence presented at trial. *Stanbury v. State*, 299 Ga. 125, 129-130 (2) (786 SE2d 672) (2016); *Hamm v. State*, 294 Ga. 791, 794-797 (2) (756 SE2d 507) (2014).[12]

However, the record makes clear that Vasquez intentionally relinquished his right to have the jury instructed as to the accomplice-corroboration requirement under OCGA § 24-14-8. Under the plain error analysis articulated in *Kelly*, an objection is

---

[12] The Attorney General argues that such an instruction was not required under this Court's decision in *Jackson v. State*, 294 Ga. 34, 36 (2) (751 SE2d 63) (2013), which noted in dicta that "[w]here an accomplice witness's testimony is independently corroborated, a jury instruction on corroboration is not required, whether or not the charge was requested by counsel." However, this proposition in *Jackson* (and a line of cases preceding it) was explicitly overruled in *Hamm*. Curiously, the Attorney General's brief later cites *Hamm* for the proposition that failure to give the charge can, in some circumstances, constitute a harmless error but did not note that *Hamm* overruled *Jackson*. We remind all litigants of their duty to determine whether a prior decision of this Court remains a binding precedent before citing it for a proposition in support of its position.

intentionally relinquished or abandoned if it is "affirmatively waived." Applying the standard articulated in *United States v. Olano*, 507 U. S. 725 (113 SCt 1770, 123 LE2d 508) (1993), we have contrasted such a waiver — the intentional relinquishment of a known right — with "forfeiture," which is the mere "failure to make the timely assertion of the right." (Citation and punctuation omitted.) *Cheddersingh v. State*, 290 Ga. 680, 684 (2) (724 SE2d 366) (2012). An affirmative waiver may occur, for example, when a defendant requests a specific jury instruction but later withdraws such request, see *Walker v. State*, 301 Ga. 482, 485 (2) (a) (801 SE2d 804) (2017); explicitly requests a jury instruction that he later argues on appeal should not have been given, see *Brown v. State*, 298 Ga. 880, 882 (3) (785 SE2d 512) (2016), and *Woodard v. State*, 296 Ga. 803, 810 (3) (a) (771 SE2d 362) (2015); or objects to a charge that he later argues on appeal should have been given, see *Shank v. State*, 290 Ga. 844, 845 (2) (725 SE2d 246) (2012). In such circumstances, the defendant has "invited the alleged error, and it therefore provides no basis for reversal." *Shank*, 290 Ga. at 845 (2).

Generally, counsel's silence at a juncture when a request for —

or objection to — a jury instruction might have been made will be

considered merely a forfeiture for which plain error review remains

available. *Cheddersingh*, 290 Ga. at 684 (2). However, *Cheddersingh*

indicates that the appellate court can conclude that the defendant's

right — or objection — to a particular instruction was intentionally

relinquished if the appellate court can "discern [a] tactical reason on

the part of the defense" for failing to request (or object to, as the case

may be) a specific jury instruction. Id. at 684 (2) (citing *United States

v. Quinones*, 511 F3d 289, 321 (E) (4) (2d Cir. 2007)). Federal courts

have articulated a similar approach to plain error review where it

appears that the failure to make a request or an objection was based

on counsel's tactical choice.  See, e.g., *United States v. Etienne*, 772

F3d 907, 913 (II) (A) (1) (1st Cir. 2014) ("We reverse only sparingly

in the plain error context, and we should be especially loath to do so

where it appears from the record that a failure to object was the

result of counsel's trial tactics[.]" (citation omitted)); *United States

v. Yu-Leung*, 51 F3d 1116, 1122-1123 (C) (2) (2d Cir. 1995) (because

it was apparent that the failure to object to certain evidence was a strategic choice, the appeal of the admission of the evidence was waived); *United States v. Pravato*, 505 F2d 703, 705 (2d Cir. 1974) (finding no plain error in erroneous jury charge where counsel failed to object because the defendant "was undoubtedly pursuing the trial tactic of not contesting the issue [addressed by the charge]").

In this case, through our review of the record — including trial counsel's testimony at the hearing on Vasquez's motion for new trial, counsel's opening statement and closing argument, and his cross-examination of the State's witnesses — we can discern that counsel had a tactical reason for not requesting an accomplice-corroboration charge. At the hearing on Vasquez's motion for new trial, trial counsel was asked by the State whether he considered Ruiz's testimony to be accomplice testimony. Counsel replied, "No . . . our defense was she did it. She was responsible. *And I didn't really want a jury hearing instructions that they were working together or that they were somehow in cahoots on this thing.* Our defense was we were pointing fingers at [Ruiz], and that was it." (Emphasis

34

supplied.) Through this testimony, trial counsel clearly articulated on the record that his trial strategy was to place blame for Prisi's death solely on Ruiz and that this strategy was advanced by not having the trial court suggest to the jury through its charge that Ruiz and Vasquez were, or could be considered, accomplices.[13]

In addition to counsel's testimony, the trial record reflects that Vasquez's trial counsel explicitly presented this theory of the case to the jury in his opening statement and closing argument and through

---

[13] We have previously recognized that, in the context of a claim of ineffective assistance of counsel, it may be a reasonable trial strategy for the defense to forgo a request for an accomplice-corroboration charge even though it was warranted by the evidence presented at trial. See *Manner v. State*, 302 Ga. 877, 882-885 (II) (A) (808 SE2d 681) (2017) ("[I]t was not objectively unreasonable for counsel to conclude that any benefit to [defendant] in instructing the jury that [accomplice's] testimony required corroboration was outweighed by the instruction's potential conflict with the theory of defense."); *Huff v. State*, 300 Ga. 807, 812-813 (4) (796 SE2d 688) (2017) (concluding that trial counsel did not perform deficiently by failing to request an accomplice-corroboration charge because "[t]rial counsel articulated a deliberate strategic purpose in not requesting a charge on accomplice testimony" and such strategy was not patently unreasonable). Cf. *Fisher v. State*, 299 Ga. 478, 483-486 (2) (a) (788 SE2d 757) (2016) (holding that, where trial court gave single-witness instruction, the failure to request accomplice-corroboration charge constituted deficient performance where such failure was not the product of trial strategy and where it would have been "completely unreasonable" for counsel to forgo a request for such instruction). We note that Vasquez has not raised a claim of ineffective assistance of counsel in regard to this issue.

cross-examination of the State's witnesses. Accordingly, the record reflects that trial counsel elected not to request a jury instruction regarding accomplice corroboration as part of a conscious defense strategy to place blame for Prisi's death on Ruiz and to avoid any suggestion by the trial court that Ruiz and Vasquez were accomplices. Thus, we conclude that Vasquez intentionally relinquished any request for an accomplice-corroboration instruction.[14] This claim of error therefore fails at the first step of plain error review.

3. *Claims of Ineffective Assistance of Counsel*.

Vasquez argues that his trial counsel provided ineffective assistance due to his failure to object to (a) the admission of an exhibit that showed Vasquez had committed prior acts of child abuse

---

[14] We reiterate that, where not affirmatively waived, the failure of the trial court to give an accomplice-corroboration charge when it has given a single-witness charge can constitute plain error. Compare *Stanbury*, 299 Ga. at 129 (2) (plain error where trial court gave single-witness instruction but erroneously failed to give accomplice-corroboration instruction), with *Raines v. State*, 304 Ga. 582, 590-592 (3) (820 SE2d 679) (2018) (failure to give accomplice-corroboration instruction did not likely affect the outcome of the proceedings in light of omission of single-witness instruction and giving of other correct instructions).

against J. E., and (b) the trial court's instruction to the jury that a seven-year statute of limitation applied to the offense of concealing the death of another.

> To prevail on his claims of ineffectiveness, Vasquez
>
> has the burden of proving both that the performance of his lawyer was professionally deficient and that he was prejudiced as a result. To prove deficient performance, [Vasquez] must show that his trial counsel acted or failed to act in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms. To prove resulting prejudice, [Vasquez] must show a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. In examining an ineffectiveness claim, a court need not address both components of the inquiry if the defendant makes an insufficient showing on one.

(Citations and punctuation omitted.) *Stuckey v. State*, 301 Ga. 767, 771 (2) (804 SE2d 76) (2017) (citing *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984)).

(a) Vasquez argues that he received ineffective assistance from his trial counsel due to counsel's failure to object to the admission of a juvenile court order that showed Vasquez committed prior acts of child abuse against J. E. Vasquez also argues his trial counsel was

37

ineffective by failing to object to the admission of this order as an exhibit and by allowing the exhibit to be sent out with the jury during its deliberations.

Before trial, the trial court ruled that certain evidence of prior acts of child abuse committed by Vasquez against J. E. between February 7, 2007, and August 2008 was admissible under OCGA § 24-4-404 (b). In addition, the State had evidence of several out-of-court statements that J. E. made to various individuals, including law enforcement officers, counselors, and a guardian ad litem, about the circumstances of Prisi's death. Vasquez's trial counsel and the prosecutor agreed before trial that, if Vasquez would waive J. E.'s presence at trial when his hearsay statements were presented to the jury and stipulate as to the reliability of such statements, then the State would not introduce evidence of the prior acts covered by the trial court's ruling under Rule 404 (b).

Trial counsel testified at the hearing on Vasquez's motion for new trial that the juvenile court order was not covered by this agreement, as the agreement dealt only with allegations of abuse

that occurred in 2007 and 2008 while Vasquez, Ruiz, and J. E. were in Mexico after Prisi's death. The juvenile court order at issue dealt with abuse of J. E. that occurred before Prisi's death.

Counsel also testified that the juvenile court order reflected allegations that Ruiz (and Vasquez) committed acts of abuse against J. E. Trial counsel testified that, even though the juvenile court order contained information that would be harmful to Vasquez's defense, he did not object to its admission because his theory of the case was that Ruiz, not Vasquez, killed Prisi. Trial counsel believed that the juvenile court order showing prior acts of abuse by Ruiz supported that theory.

The record reflects that Vasquez's trial counsel explicitly presented this theory of the case through other avenues, as well. In his opening statement, counsel suggested that Ruiz had coached J. E. to make incriminating statements against Vasquez and that other members of her family had aided Ruiz in framing Vasquez for Prisi's death even though they were aware that Ruiz had previously been physically abusive toward Prisi. Vasquez's trial counsel, in

cross-examining the first psychologist who interviewed J. E., elicited testimony regarding parent coaching of young children as well as parental alienation syndrome, which the psychologist characterized as a form of parental manipulation in which one parent causes a child to form negative attitudes about the other parent. The psychologist admitted that children J. E.'s age are susceptible to accepting and repeating suggestions made by an adult whom the child is taught to respect that innocent adults did harmful or illegal things to them. The psychologist admitted that such influence could cause the child to believe and remember events that did not actually occur. Vasquez's trial counsel returned to these themes repeatedly in his closing argument and explicitly discussed the juvenile court order, and Ruiz's history of child abuse demonstrated by the order, as evidence that Ruiz was the actual killer.

> To show that his lawyer's performance was deficient, [Vasquez] must demonstrate that the lawyer performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. This is no easy showing, as the law recognizes a strong presumption that counsel performed reasonably, and [Vasquez] bears the burden of

40

overcoming this presumption. To carry this burden, he must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not. In particular, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

(Citations and punctuation omitted.) *State v. Spratlin*, 305 Ga. 585, 591 (2) (826 SE2d 36) (2019).

Whether the potential upside of certain evidence — in this case, the juvenile court order establishing that Vasquez and Ruiz had committed prior acts of abuse against J. E. — exceeds its downside is a question of trial strategy, and Vasquez has made no showing that his lawyer's strategy was unreasonable. See *Spratlin*, 305 Ga. at 594 (2) (a). Specifically, in light of the testimony elicited during cross-examination of the psychologist, other evidence highlighting an alleged history of abuse by Ruiz, evidence attacking Ruiz's credibility, and evidence establishing Ruiz's motive to place blame for Prisi's death on Vasquez, we cannot say that no reasonable attorney would have pursued this trial strategy or used the

41

particular tactics employed by Vasquez's counsel in this case, including allowing evidence to come in that implicated both Ruiz and Vasquez in prior acts of abuse. Vasquez has thus failed to show that the performance of his trial counsel was deficient in this regard, and this claim of ineffectiveness fails.

(b) Vasquez also argues that his trial counsel provided ineffective assistance by failing to object when the trial court instructed the jury that a seven-year statute of limitation applied to the offense of concealing the death of another. "However, for the same reasons that we concluded that [Vasquez] could not carry his burden to show prejudice on plain error review regarding this charge, we conclude that he cannot carry his burden to show prejudice on this ineffectiveness claim." *Hampton v. State*, 302 Ga. 166, 172 (4) (b) (805 SE2d 902) (2017). Even if the jury had been instructed that a four-year statute of limitation applied to the offense of concealing the death of another, it still would have convicted Vasquez of that offense as the only evidence of tolling presented in the case showed that the indictment was brought

42

before the statute of limitation ran. Thus, as there is no reasonable

probability that the outcome of the trial would have been different

had trial counsel made this objection, this claim of ineffectiveness

fails.

4. *Merger of Malice Murder and Child Cruelty Offenses*.

Vasquez argues that his convictions for child cruelty in the first

degree should have merged with his conviction for malice murder.

But, as we have previously held, under the *Drinkard* test,[15] these

two offenses do not merge.

> Malice murder, but not cruelty to children [in the first degree], requires proof that the defendant caused the death of another human being. Cruelty to children [in the first degree], but not malice murder, requires proof that the victim was a child under the age of 18 who was caused cruel or excessive physical or mental pain. Therefore, each crime requires proof of at least one additional element which the other does not. Furthermore, the crimes of malice murder and cruelty to children [in the first degree] are not so closely related that multiple convictions are prohibited under other provisions of OCGA § § 16-1-6 and 16-1-7. Accordingly, even if the same conduct establishes the commission of both malice murder and cruelty to children [in the first degree], the two crimes do not merge.

---

[15] See *Drinkard v. Walker*, 281 Ga. 211 (636 SE2d 530) (2006) (adopting "required evidence" test for determining whether two different offenses merge).

(Citations and punctuation omitted.) *Linson v. State*, 287 Ga. 881, 885-886 (4) (700 SE2d 394) (2010). Accordingly, this enumeration is meritless.

*Judgment affirmed. All the Justices concur.*

Decided June 20, 2019.

Murder. Gwinnett Superior Court. Before Judge W. Davis.

*Jessica R. Towne*, for appellant.

*Daniel J. Porter, District Attorney, Richard A. Vandever, Lee F. Tittsworth, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.