**FOURTH DIVISION**
**DOYLE, P. J.,**
**COOMER and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 11, 2020**

# In the Court of Appeals of Georgia

A19A2035. MCFADDEN v. THE STATE.

DOYLE, Presiding Judge.

Following a jury trial, Nevins McFadden[1] was found guilty of two counts of cruelty to children in the first degree, two counts of aggravated battery, aggravated assault, and two counts of giving a false name, address, or date of birth. The trial court denied his amended motion for new trial, and McFadden appeals, arguing that (1) the trial court plainly erred by failing to give a jury instruction on accomplice testimony; (2) he received ineffective assistance of counsel; and (3) the trial court erred by failing to merge certain counts at sentencing. For the reasons that follow, we affirm.

---

[1] We note that differing spellings of McFadden's first name appear in the record some as "Nevin" while the indictment and judgment of conviction list the spelling as "Nevins."

Viewed in the light most favorable to the verdict,[2] the evidence shows that the mother gave birth to L. B. in April 2010, and the two moved from Maryland to Atlanta in the summer of 2010 with the mother's parents.[3] In October 2010, the mother and L. B. moved in with a female friend, and around that same time, the mother enrolled L. B. in a daycare that was run by Tanya Lobo. In late 2010 or early 2011, the daycare needed a teacher, so the mother began working there; Lobo became L. B.'s godmother, and the mother and L. B. also moved in with Lobo for a few months before moving into their own apartment.

In the early morning hours of August 26, 2012, the mother took L. B. to an emergency room because L. B. was lethargic, unreactive, pale, and limp, and she had vomited blood. The mother reported to emergency room personnel that L. B. had fallen on the playground earlier in the week and had not been acting like herself, so the mother had taken the child to a hospital on August 22 at which time a computed tomography ("CT") scan was performed but had revealed no injury. Based on this

---

[2] See *Walker v. State*, 348 Ga. App. 273 (1) (821 SE2d 567) (2018), quoting *Rankin v. State*, 278 Ga. 704, 705 (606 SE2d 269) (2004), citing *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

[3] L. B.'s biological father was not involved with her at this time. And at the time of the events herein, the mother's family of origin had moved out of Georgia.

history and the child's lack of response to stimulus, the emergency room doctor ordered another CT scan, which revealed an occipital skull fracture (a depression fracture on the back of her head) and bleeding in her brain near the fracture. The doctor also observed dried blood in the child's left ear canal and bruising on the ear itself, a bruise on her forehead, a few small scratches, and blood in the white of her right eye. The doctor intubated L. B. in order to protect her airway in case her condition deteriorated, and she was transported via helicopter to a local children's hospital. At the children's hospital, L. B. was found to have liver injuries, lung contusions, and injuries to her buttock, including a human bite mark.

The mother testified that she met McFadden after moving out of Lobo's home and began a relationship with him that was good at first; they were not in a relationship long before they moved in together on August 1, 2012, after which time he complained about her spending time with L. B. or about L. B. whining and crying. The mother's relationship with McFadden quickly deteriorated during the month of living together, and in the week leading up to the incident, they got into an argument in which he strangled and kicked her and bit her ear so hard that she thought he would bite it off; he also pulled her gun out of the closet and threatened her with it; and he threatened her not to call the police on him. On Tuesday evening prior to the

3

incident, the mother left the child sleeping at home with McFadden there while she went to the grocery store and a fast food restaurant and returned to find L. B. crying uncontrollably and McFadden yelling to never leave her with him again. L. B. had scratches on her face and McFadden indicated that she probably scratched herself with the mother's cuticle scissors, which the mother testified were in a location L. B. would not have been able to reach. The next morning, the mother took L. B. to the hospital because she threw up and had blood in her ear, and the mother wanted to check on her; she did not call the police or report what had happened that evening because she was frightened, instead telling hospital attendants that L. B. had fallen on the playground.

The mother testified that on August 25, she and McFadden got into an argument about rent because he felt he should not have to pay for L. B.'s portion, he wanted to move into the child's bedroom and have the mother and L. B. share a room, and he wanted to simply be roommates with the mother. Eventually it was determined that McFadden would stay through the end of the month (based on his previous payment of half the rent) and then leave; but around 2:00 a.m., McFadden woke the mother to discuss their relationship. The mother heard what she believed to be L. B. whimpering, and she found L. B. in a pool of vomit mixed with blood; she took L. B.

to the bathroom to clean her, but the child was unresponsive. The mother testified that she believed driving to the hospital would be faster than calling for an ambulance, and McFadden drove them but stayed in the car.

The mother testified that initially she believed that the doctors had missed something from the April 22 hospital visit, and she was not aware that L. B. had sustained additional injuries since that time. The mother testified that she drove McFadden home while L. B. was airlifted to the children's hospital because he demanded to go home, and she proceeded to the children's hospital to be with L. B.; upon arriving, she was questioned by a social worker and multiple doctors. She admitted that she was not forthcoming with information about McFadden when she was interviewed, and she gave a fake name for him because she was afraid. The mother's various interviews were played for the jury, and she testified to her state of mind and her interactions with McFadden during that time frame; after her first interview, she called the detective working on the case and provided McFadden's real name, and during her third interview, she admitted she was dishonest about the story she had told about L. B. getting injured on the playground. After providing detectives with this information, she assisted them in speaking with McFadden in person by luring him to the apartment while officers were there.

5

Lobo testified that L. B. had come to daycare on Monday prior to her hospitalization and was fine, but she had not attended Tuesday or Wednesday, at which point Lobo had called the mother, who told her that L. B. had fallen down at the playground. On that Friday, L. B. had been at daycare and Lobo had noticed scratches on her face. The mother did not go to work that day, and instead she stayed at the daycare; Lobo observed that the mother had lost a lot of weight and looked depressed. The mother acknowledged that she had a new boyfriend, but Lobo did not know how long they had been together; Lobo had observed over the course of the previous three or four months that the mother had lost weight and was becoming more reserved. Lobo observed that while L. B. had not changed her behavior toward the mother over the last few months and was very clingy toward the mother, L.B. started to object to going home and instead wanted to stay at the daycare at the end of the day. Lobo testified that prior to the weekend of L. B.'s hospitalization, the mother and Lobo made plans for the mother and L. B. to spend the weekend at Lobo's home for a long visit, but the mother called and canceled because she said L. B. was catching a cold. Lobo never had concerns about the mother's parenting, she described the mother as spoiling and loving L. B. L. B. continued to attend the daycare through August 27, 2012, at the time of the incident giving rise to the charges against

6

McFadden. The mother's supervisor at her job during the incident testified that the mother was a model employee until about two months prior to her daughter's hospitalization, at which point the mother became withdrawn, was often tardy or absent, and was not like herself.

The State also presented the testimony of Dr. Thomas David, a doctor of dentistry who holds an appointment as a forensic odontology consultant with the State of Georgia Medical Examiner's Office and with the crime lab. David explained during his expert voir dire that forensic dentistry was the application of dentistry to the law, and he was board certified in the field. David testified that he had been certified as an expert in dentistry and forensic dentistry between 30 or 40 times in cases in Georgia, between 15 to 20 of those cases being criminal matters, and he had testified on behalf of both the State and the defense in different matters. The trial court accepted him as an expert in forensic dentistry without objection from McFadden.

David testified that he compared two sets of teeth from casts given to him by the State with pictures of bite mark injuries that appeared on L. B. David was able to exclude the mother as the biter to have made the marks on L. B. based on a number of discrepancies in the tooth placement compared to the appearance and spacing of the teeth in the bite mark injuries, but he could not exclude McFadden's as having been

7

the biter based on his lower tooth arch. On cross-examination, David admitted that bite mark analysis was not a precise science, and there were some parallels with fingerprint comparison. The State also presented experts to testify regarding domestic violence situations and child abuse.

The detective who interviewed the mother and McFadden testified that during his interview, McFadden was very aggressive and not calm. The interview was played for the jury, and McFadden initially gave his name as Christopher McFadden and then gave his name as Antonio Johnson. The detective also identified pictures of the apartment, including blood and vomit in the child's bed and a hole in a wall that looked like it was made by a fist that the mother said was made by McFadden. In his interview, McFadden stated that he came to the apartment at 8:00 p.m. on the night of the incident, went to sleep, and was awakened to the mother screaming about L. B. being injured; he denied knowing what had happened to the child on any of the dates in question.

After McFadden was charged in the case, he was released on bond and fitted with an ankle monitor. On May 6, 2015, his ankle monitor registered an alarm for tampering, he failed to respond to monitoring service phone calls, and he missed an appearance for this case. Thereafter, a bench warrant was issued for him, but

8

McFadden was not apprehended until September 2015 (the trial occurred in December 2015).

At the close of the State's case, McFadden moved for a directed verdict, which the trial court denied, and McFadden presented no witnesses in his defense. The jury found McFadden guilty on all counts.

1. McFadden first argues that the trial court committed plain error by failing to charge the jury on the law requiring corroboration of accomplice testimony because there was at least slight evidence that the mother was his accomplice, and thus, her testimony was not sufficient absent corroboration to establish a fact. We disagree.

The trial court instructed the jury that "[t]he testimony of a single witness, if believed, is sufficient to establish a fact. Generally, there's no legal corroboration requirement of a witness, provided you find the evidence to be sufficient." Under OCGA § 24-24-8, however, if "the only witness is an accomplice, the testimony of a single witness shall not be sufficient [though] corroborating circumstances may dispense with the need for the testimony of a second witness[.]" McFadden did not request that the accomplice-corroboration charge be given to the jury, nor did he object to its omission.

In the context of jury instruction errors, plain errors are evaluated on appeal under the following four-part test: First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.[4]

We find the Georgia Supreme Court's decision in *Vasquez v. State*[5] instructive in this instance. In *Vasquez*, the Court determined that because the defendant had made a tactical choice to argue that the later-alleged accomplice was the sole perpetrator of the crimes, the defendant had intentionally relinquished his right to an accomplice-corroboration instruction and could not establish plain error.[6] Here, although there was slight evidence that McFadden and the mother could have had an

---

[4] (Punctuation omitted.) *Vasquez v. State*, 306 Ga. 216, 225 (2) (830 SE2d 143) (2019), quoting *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011).

[5] 306 Ga. at 229-231 (2) (c).

[6] See id.

accomplice relationship, defense counsel testified at the motion for new trial hearing and explained that the strategy she and McFadden pursued was that McFadden was not involved in causing L. B.'s injuries or in covering up any crime in any capacity. His theory of the case was that the mother was solely responsible for the child's injuries and that the mother was not a credible witness, as established by the multiple statements she gave to police, including repeatedly lying about the reasons for her first visit to the hospital. Accordingly, like the defendant in *Vasquez*, McFadden intentionally relinquished the right to have the accomplice-corroboration instruction presented to the jury, and therefore, "[t]his claim of error . . . fails the first step of plain error review."[7]

2. McFadden next argues that he received ineffective assistance of counsel.

To obtain relief based on ineffective assistance of counsel [pursuant to *Strickland v. Washington*,][8] an appellant must show both that his counsel's performance was constitutionally deficient and that this deficient performance prejudiced him. . . . To prove deficient performance, [McFadden] must show that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms. To show prejudice,

---

[7] Id. at 231 (2) (c).

[8] 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984).

11

[McFaddden] must prove that his lawyer's error was so serious as to deprive him of a fair trial, a trial whose result is reliable. To that end, an appellant must show a reasonable probability sufficient to undermine confidence in the outcome that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different. An appellant must prove both prongs of the *Strickland* test, and if he fails to prove one prong, it is not incumbent upon this Court to examine the other prong. In reviewing either component of the inquiry, all factual findings by the trial court will be affirmed unless clearly erroneous.[9]

(a) McFadden first contends that his counsel was ineffective for failing to object to introduction of bad character evidence, namely the mother's testimony that he physically assaulted her, threatened her, and pulled a gun on her in the days leading up to L. B.'s injury, as well as failing to object to introduction of the mother's temporary protective orders taken out against McFadden after the incident. In its order denying McFadden's motion for new trial on this issue, the trial court found that any objection to the evidence would have been fruitless because the evidence was "appropriately admitted for consideration by the jury."[10]

---

[9] (Citations and punctuation omitted.) *Williams v. State*, 305 Ga. 776, 778 (2) (827 SE2d 849) (2019), quoting *Anthony v. State*, 303 Ga. 399, 410 (9) (811 SE2d 399) (2018).

[10] "The failure to make a meritless objection cannot serve as a ground for an ineffective assistance claim." *Faulkner v. State*, 295 Ga. 321, 326 (4) (758 SE2d 817)

The general requirements for the admission of evidence of other acts under Rule 404 (b) are relevance to an issue other than character, admissibility to the extent that the evidence is sufficient to permit a jury to conclude by a preponderance of proof that the defendant actually committed the other acts, and passing muster under Rule 403, which weighs the relevance of evidence of other acts against, inter alia, unfair prejudice to the defendant; application of the bar of Rule 403 is principally a matter of the trial court's discretion but is an extraordinary remedy which should be used only sparingly.[11]

We agree that some of this evidence may have been initially excluded by the trial court on direct-examination of the mother had McFadden objected. Nevertheless, based on McFadden's trial strategy and questions posed in cross-examination of the mother, the evidence was admissible in response to the attacks on her credibility and in order to explain why she withheld information from police.[12] Accordingly, McFadden has failed to meet his burden under *Strickland*, and the trial court did not err by denying his motion for new trial as to this issue.

---

(2014).

[11] *Davis v. State*, 302 Ga. 576, 581 (2) (805 SE2d 859) (2017).

[12] See id. See also *Strother v. State*, 305 Ga. 838, 845-847 (4) (b) & (c) (828 Ga. App. 327) (2019).

(b) Next, McFadden contends that his trial counsel was ineffective for failing to challenge expert testimony regarding bite mark analysis under *Harper v. State*.[13]

> Under the longstanding precedent of *Harper*, scientific evidence is not admissible in criminal cases unless the procedure or technique in question has reached a scientific stage of verifiable certainty. It is the role of the trial court to determine whether a scientific procedure or technique constitutes competent evidence under *Harper*, and the trial court's determination will not be disturbed absent a clear abuse of discretion. The trial court may make this determination from evidence presented to it at trial by the parties; in this regard expert testimony may be of value.[14]

Nevertheless, as the trial court concluded, this expert testimony was based on observation, skill, and the experience of comparing dental impressions to records of purported bite marks. The expert did not conclude that McFadden was the individual who bit the child, but testified that he could not rule out McFadden as the biter based on the visual appearance of McFadden's teeth and spacing in his jaws compared to the impressions of teeth that appeared on the child's skin. Given that expert testimony based solely on an expert's observation of physical objects and appearance generally

---

[13] 249 Ga. 519 (1) (292 SE2d 389) (1982).

[14] (Punctuation omitted.) *Reinhard v. State*, 331 Ga. App. 235, 239-240 (3) (770 SE2d 314) (2015), quoting *Fortune v. State*, 304 Ga. App. 294, 298 (2) (696 SE2d 120) (2010).

does not constitute evidence that is subject to the *Harper* test,[15] McFadden has failed to establish that his counsel's failure to raise such an objection was unreasonable, and therefore, the trial court did not err by denying his motion for new trial on this issue.[16]

3. Finally, McFadden contends that the trial court erred by failing to merge two counts of child cruelty in the first degree with two counts of aggravated battery.

> OCGA § 16-1-7 (a) provides: [w]hen the same conduct of an accused may establish the commission of more than one crime, the accused may be prosecuted for each crime. He may not, however, be convicted of more than one crime if: (1) One crime is included in the other; or (2) The crimes differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific

---

[15] See *Reinhard*, 331 Ga. App. at 240 n.3, citing *Belton v. State*, 270 Ga. 671, 673 (4) (512 SE2d 614) (1999) (explaining that "the comparison of shoe prints to the external physical characteristics of particular shoes is not a matter of scientific principle or technique" to which *Harper* does not apply).

[16] See *Reinhard*, 331 Ga. App. at 240 n.3. See also *Ridley v. State*, 290 Ga. 798, 800 (2) (725 SE2d 223) (2012) (bite mark analysis); *Cromartie v. State*, 270 Ga. 780, 787 (18) (514 SE2d 205) (1999) (shoe print evidence); *Belton*, 270 Ga. at 673-674 (4) (visual comparison of shoe prints); *Salinas v. State*, 313 Ga. App. 720, 722-724 (1) (722 SE2d 432) (2012) (visual identification of narcotics); *Jefferson v. State*, 312 Ga. App. 842, 849-850 (2) (c) (720 SE2d 184) (2011) (addressing an expert's testimony regarding her examination of duct tape on the microscopic level and explaining which portions should have been subject to a *Harper* analysis and which portions were admissible under *Belton*). We note that defense counsel provided a thorough cross-examination of the expert, which included numerous questions directed at undermining the reliability of bite-mark comparison.

15

instance of such conduct. Whether offenses merge is a legal question, which we review de novo.[17]

McFadden was charged with one count of cruelty to children in the first degree requiring proof that McFadden caused L. B. cruel or excessive physical pain by fracturing her skull, and he was charged with a second count of cruelty to children in the first degree for causing L. B. cruel or excessive physical pain by lacerating and bruising her liver.[18] Both of those charges required that the State prove L. B. was a child under the age of 18.[19] McFadden also was charged with aggravated battery related to those same two injuries, which required the State to establish that McFadden maliciously caused L. B. bodily harm "by seriously disfiguring" a member of L. B.'s body by fracturing her skull and by lacerating and bruising her liver.[20] When reviewing a similar case, the Georgia Supreme Court found that the crimes of cruelty to children in the first degree and aggravated battery "require[] proof of at least one

---

[17] (Punctuation omitted.) *Womac v. State*, 302 Ga. 681, 684 (3) (808 SE2d 709) (2017) (applying merger test from *Drinkard v. Walker*, 281 Ga. 211 (636 SE2d 530) (2006)).

[18] See OCGA § 16-5-70 (b).

[19] See id.

[20] OCGA § 16-5-24 (a).

16

additional element [that] the other does not[, and] the two crimes are not so closely related that multiple convictions are prohibited. . . ."[21] Accordingly, this enumeration is without merit.

*Judgment affirmed. Coomer and Markle, JJ., concur.*

---

[21] *Waits v. State*, 282 Ga. 1, 4-5 (2) (644 SE2d 127) (2007), overruled on other grounds by *State v. Lane*, __ Ga. __ (Case No. S19A1424, decided Feb. 10, 2010).