313 Ga. 203
FINAL COPY

S21A1038.  FORTSON v. THE STATE.

ELLINGTON, Justice.

A Fulton County jury found Demetruis Fortson guilty of felony

murder predicated on armed robbery, hijacking a motor vehicle, and

possession of a firearm during the commission of a felony, among

other offenses, related to the shooting death of Nicholas Hagood.[1] On

---

[1] Hagood was shot to death on March 26, 2014. Fortson and his co-defendants, Tavius Bates, Octavious Jordan, Jeremy Southern, and Stephen Willis, were indicted by a Fulton County grand jury on July 18, 2014, for malice murder, felony murder predicated on armed robbery, felony murder predicated on hijacking a motor vehicle, felony murder predicated on aggravated assault, armed robbery, hijacking a motor vehicle, aggravated assault, and possession of a firearm during the commission of a felony. Willis was also indicted for possession of a firearm by a convicted felon and for felony murder predicated on that possession charge. Fortson and his co-defendants were jointly tried in August and September 2017. The jury found Fortson not guilty of malice murder and guilty of the remaining counts with which he was charged. The jury found Southern guilty of all charges and Bates, Jordan, and Willis not guilty of malice murder and guilty of the remaining counts with which they were charged. Fortson was sentenced to life imprisonment for felony murder predicated on armed robbery, 20 years in prison for hijacking a motor vehicle to be served concurrently with the sentence for felony murder, and a consecutive five-year suspended sentence for possession of a firearm during the commission of a felony. The counts of felony murder predicated on hijacking a motor vehicle and aggravated assault were vacated as a matter of law, and the armed robbery and aggravated assault counts merged into the felony murder conviction. Fortson filed a timely motion for new trial on September 25, 2017,

appeal, Fortson contends that the evidence presented at his trial was insufficient to support his convictions, and that the trial court erred in denying his motions for a new trial in its capacity as the "thirteenth juror" and for a directed verdict. For the reasons that follow, we affirm.

Viewed in a light most favorable to the jury's verdicts, the evidence presented at trial showed the following. On March 26, 2014, two men carrying handguns robbed Rayshon Smith at an apartment complex in Cobb County and took his wallet, his cell phone, and his mother's keys. Approximately 40 minutes later, Hagood was shot to death at a nearby apartment complex in Fulton County. The perpetrators took Hagood's car and cell phone. Police found items taken from Smith at the earlier robbery, his wallet and his mother's keys, near Hagood's body.

At the joint trial of Fortson, Tavius Bates, Octavious Jordan,

which he amended on September 7, November 23, and December 15, 2020. Following a hearing, the trial court denied the motion for new trial, as amended, on January 13, 2021. Fortson filed a timely notice of appeal, and the case was docketed to the August 2021 term of this Court and submitted for a decision on the briefs.

2

Jeremy Southern, and Stephen Willis, the State sought to establish Fortson's participation in the crimes against Hagood by circumstantial evidence. This included evidence of movement on the day of the shooting of cell phones associated with Fortson's co-defendants to the area of Fortson's home, then to the area of the armed robbery and shooting, back to the area of Fortson's home, and then to the area where Hagood's stolen phone was located; testimony showing that a participant in the crimes against Smith and Hagood wore a dreadlock or "twists" hairstyle, and testimony and photographic evidence showing that Fortson had a dreadlock or twists hairstyle while Fortson's co-defendants all had close-cut hair; Fortson's access to his mother's phone; the movement of that phone from the area of Fortson's home to the area where Hagood's phone was located several hours after the shooting; and calls made after the crimes by the phone stolen from Smith to persons closely associated with Fortson.

More specifically, the evidence showed that on the morning of March 26, Alexis Brewer picked up Fortson at his home in Decatur

and they drove to their child's doctor's appointment. Afterward, she dropped Fortson off at his home between 11:30 a.m. and noon.

Also on March 26, Smith and his mother drove to an apartment in Austell to visit cousins. Smith went outside, where he phoned his grandmother at 12:34 p.m. While he was on the phone, Smith noticed a car carrying three or four occupants as it slowly drove by. Shortly thereafter, two men walked up to him. Both of the men pointed guns at Smith. One of the men went through Smith's pockets, taking his wallet, his cell phone, and his mother's car keys. According to Smith, the other man, who was skinny with his hair styled in "low dreads or twists," asked him for the code to unlock his phone.

After the robbery, Smith went inside and informed his mother, who called 911 at 12:39 p.m. In a later interview, Smith identified Southern from a photographic lineup as the man who went through his pockets.

At 1:16 p.m. on March 26, Joseph James called 911 to report that a man was being robbed at an apartment complex on Martin

Luther King, Jr. Drive in Fulton County. During that call, James said that he had seen two cars, with one person in one car and four people in the other car.[2] The apartments were located approximately two miles from the Austell area in Cobb County, where Smith was robbed. Officers responding to the scene found Hagood lying dead on the sidewalk. Police recovered a wallet, a set of keys, and a spent .380 shell casing at the scene. The wallet and keys were the ones stolen from Smith during the earlier armed robbery. The medical examiner determined that Hagood was killed by a gunshot wound to the torso.

James testified at trial that on the afternoon of March 26, he looked out his apartment window and saw that two cars had pulled up. James saw a white male, later determined to be Hagood, whom he described as seeming to be "out of place and slightly disoriented," and a man with a "dreads" hairstyle standing next to the first car. One person remained in the first car. The second car, which was

---

[2] At trial, James testified that there were two people in the first car and four people in the second car.

parked closely behind the first car, appeared to James to be "full to capacity," although he only got a good look at the person in the front passenger's seat.

The man with the dreadlocks appeared to want something from Hagood, who checked his pockets and said, "I don't have it." James testified that the man with the dreadlocks began to "check" Hagood as if to determine whether he did have something, while a man holding a firearm exited the second car. When James saw the man with the gun, he told the other people in his apartment to get down, and he then heard a gunshot. After the gunshot, James looked out the window and saw the two cars driving off in the same direction. He then called 911.[3]

Robin Bailey, another resident of the apartment complex, testified at trial that she looked out her window on March 26 and saw what she described as a "commotion" and a car "rolling slow."

---

[3] James later identified Bates in a photographic lineup as the man who went through Hagood's pockets. James acknowledged at trial that he had been "troubled" at the time of his identification because that "guy had dreads," while the photograph of Bates did not show Bates wearing dreadlocks. James affirmed during his testimony that Bates's face "[stuck] out" to him when he made the identification.

6

She also saw a second car. A person wearing a hood ran up to the first car, jumped inside, then stuck his hand out the window, which was followed by a "pow" sound. Bailey took cover, and the police had arrived by the time she looked outside again.

An Atlanta police detective investigated the shooting of Hagood. The detective testified at trial and offered his opinions as an expert in cell phone technology and forensics data recovery and analysis. In reviewing the records associated with Hagood's phone, the detective saw that a text message was sent to that phone at 1:29 p.m. on March 26, which was after James had called 911. But the message was not received by the phone until 3:10 p.m. Based on the cell tower the phone "pinged" off, the detective determined that at the time Hagood's phone received the text message, it was located at the Whispering Pines Apartments complex in Decatur. Co-defendant Jordan's aunt lived in those apartments, and Jordan and Bates were staying at a hotel less than a mile away.

After Smith's phone was stolen, it showed activity beginning at approximately 9:00 p.m. on March 26 and for several days

7

thereafter. Smith's phone was used to call phones associated with Southern, Willis, Jordan's girlfriend Kiara Shy, as well as Fortson's mother, Fortson's cousin Maurice, and Brewer, among others. Most of the calls placed and received by Smith's phone after the robbery utilized cell towers in the area of Candler Road and Interstate 20. Similarly, two hours after Hagood was killed, his cell phone was located within what the detective described as the "Candler Road/I-20 corridor." The detective canvassed apartment complexes in that area until he found Hagood's car about a quarter mile from the hotel where Bates and Jordan were staying.

After determining that Smith's stolen phone had been in contact with Fortson's mother's phone and Southern's phone, the detective interviewed Fortson's mother. He asked her for the names of her children, and she named three but failed to mention Fortson. She initially denied knowing Southern, but eventually acknowledged that she had known him for a long time. The detective later drove west from Fortson's home to the area of Smith's robbery and found that the trip took approximately 20 minutes.

At trial, Fortson's mother testified that Fortson did not have a phone and used her phone sometimes, and that people got in touch with Fortson by calling her phone. Fortson's mother said that she received a call from Southern around noon on the day of the robbery and shooting, when she was eating breakfast at a neighbor's house. Southern was looking for Fortson, and she told Southern that Fortson had taken his baby to the doctor. According to Fortson's mother, when Fortson got home she told him that Southern had called. She also testified that she received a call around 4:00 p.m. from a person she did not know who was looking for Fortson and that she told the caller that Fortson had left with his cousin.[4]

In addition to the records of the victims' phones, the detective reviewed the cell phone records of Bates, Jordan, Southern, Willis, and Fortson's mother. The detective testified that on March 26,

---

[4] The evidence showed that Fortson's mother was using her phone between 12:05 p.m. and 3:19 p.m. The State identified people who were in contact with Fortson's mother's phone during that time period, and those individuals were called as witnesses at trial and testified that they had spoken with Fortson's mother. Fortson's mother was not asked during her testimony if she traveled during the day of the robbery and shooting, or whether Fortson or another person used her phone that day.

Jordan's and Southern's cell phones communicated with Willis's cell phone around 10:45 and 11:00 a.m., at which time all three phones were in the Stone Mountain area. When Southern called Fortson's mother's cell phone at 12:05 p.m., Southern's phone utilized a tower approximately 1.6 miles south of Fortson's home on Bouldercrest Road.[5] According to the detective, the data showed that Southern's phone was moving in the direction of Fortson's home during the course of the call.[6] Jordan's, Southern's, and Willis's phones later utilized cell towers near the area and around the times of Smith's robbery and Hagood's shooting. Approximately 30 minutes after the shooting, Bates's, Jordan's, and Willis's phones utilized cell towers near Fortson's home.[7] From around noon to 1:45 p.m., after Hagood

---

[5] According to the detective, Southern lived about five or six miles east of Bouldercrest Road.

[6] Southern's phone's exact location at the time of the call was not specified, and there was no testimony as to how long it would have taken for Southern to reach Fortson's home after the call, only that it was an approximately 20-minute drive from Fortson's home to the scene of Smith's robbery. As the crimes against Smith occurred at 12:34 p.m., 29 minutes after the 12:05 p.m. call, Southern would have had an approximately nine-minute window to pick up Fortson after that call in order for Fortson to have driven with others to Smith's robbery.

[7] As noted above, Bates and Jordan were then staying at a hotel in the Candler Road/I-20 area. Phone calls made in that area utilized cell towers

10

was shot, none of Fortson's co-defendants' phones called each other, which contrasted to other times during the day.

At 2:09 p.m., Bates's phone called Jordan's phone while in the vicinity of the apartment complex where Hagood's phone received the text message at 3:10 p.m. that day. At 2:11 p.m., Southern's phone used cell towers in that area, as did Jordan's phone at 2:39 p.m., and Willis's phone at 2:55 p.m. At 3:53 p.m., a call by Fortson's mother's phone utilized the same cell tower used by Hagood's phone approximately 40 minutes earlier.[8] The detective determined that the call was made to a landline belonging to Fortson's grandmother.

Shy, who was Bates's cousin as well as Jordan's girlfriend, testified that she also knew Fortson and Southern, and that she had been in the same room with Bates, Fortson, Jordan, and Southern

different than those utilized by calls made in the Bouldercrest Road area. The evidence did not show where Willis was living on the day of the robbery and shooting, but Willis's phone records did not show any previous activity by his phone within the Bouldercrest Road area.

[8] On cross-examination, the detective acknowledged that Fortson's mother's phone could have been up to two miles away from the tower when it made the 3:53 p.m. phone call.

as they talked and played cards.[9] Shy also testified that Bates's hair was "cut low," and that he had not to her knowledge ever worn a twists or dreadlocks hairstyle. However, she identified two pictures of Fortson and said that he was depicted as wearing a twists hairstyle in one photograph and a dreadlocks hairstyle in the other.[10]

The State also entered into evidence photographs of the five co-defendants which showed their physical appearance at the time the detective encountered them in 2014. Fortson, whom the detective encountered in June, is the only defendant depicted with what could be called a dreadlocks hairstyle.

1. Fortson contends that the evidence was insufficient for a rational trier of fact to find him guilty of felony murder predicated on armed robbery, carjacking, and possession of a firearm during the commission of a felony.[11] When evaluating the sufficiency of

_____

[9] Shy was not asked to specify when she had been in the same room as Bates, Fortson, Jordan, and Southern.

[10] The State did not establish when the photographs were taken.

[11] Fortson also contends that the evidence was insufficient to support his convictions for the felony murder counts predicated on aggravated assault and

evidence, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). This Court views the evidence in the "light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013) (citation and punctuation omitted).

Further, as a matter of Georgia statutory law, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. However, "not every hypothesis is a reasonable one, and the evidence need not exclude every *conceivable* inference

hijacking a motor vehicle, which were vacated by operation of law, and the armed robbery and aggravated assault counts, which merged into the count of felony murder predicated on armed robbery. Any challenge as to the sufficiency of the evidence as to these counts is moot. See *Collett v. State*, 305 Ga. 853, 855 (1) n.2 (828 SE2d 362) (2019) (holding that the appellant's challenges to the sufficiency of the evidence to sustain guilty verdicts on counts that were merged or vacated by operation of law were moot).

or hypothesis — only those that are reasonable." *Graves v. State*, 306 Ga. 485, 487 (1) (831 SE2d 747) (2019) (citation and punctuation omitted; emphasis in original). "Whether alternative hypotheses are reasonable . . . is principally a question for the jury, and this Court will not disturb the jury's finding unless it is insupportable as a matter of law." *Robinson v. State*, 309 Ga. 729, 731 (1) (a) (848 SE2d 441) (2020).

Fortson argues that the crimes were committed by four people, not five, because James identified five men at the scene in his 911 call, one of whom was the victim. Fortson also contends that the State relied on evidence of calls to or from his mother's cell phone, which did not connect him to the crimes, and that the wholly circumstantial evidence was insufficient to establish he was a party to the crimes. The State failed, Fortson asserts, to carry its burden of disproving any reasonable hypothesis other than his guilt.

James testified at trial that there were "four guys in the one car and it was two people in the other car," and when confronted with the difference between that statement and his 911 call,

14

responded, "I can't remember." It was for the jury to resolve any conflicts in the evidence. See *Bonner v. State*, 311 Ga. 466, 468 (2) (858 SE2d 496) (2021). They were not bound to conclude that only four people were involved in the crimes against Hagood.

Notwithstanding Fortson's argument regarding the calls made by Fortson's mother's phone, the circumstantial evidence connecting Fortson to the crimes is not limited to these calls, as discussed below. The calls are also relevant to whether Fortson participated in the crimes. The first two calls show that Southern was attempting to contact Fortson, and the detective testified that Southern's phone was in the vicinity of and moving toward Fortson's home when the second call was made at 12:05 p.m. Brewer's testimony places Fortson at his home before the second call. The 3:53 p.m. call shows that Fortson's mother's phone was near the location of Hagood's phone when Hagood's phone received a text at 3:10 p.m. This location was in what the detective described as the Candler Road and I-20 area, and not the Bouldercrest Road area near Fortson's home, where Fortson's mother's phone had been located earlier in

15

the day. And in her testimony, Fortson's mother acknowledged that Fortson sometimes used her phone.

Turning to evidence in addition to the calls involving Fortson's mother's phone, testimony showed that Fortson was friends with Bates, Jordan, and Southern. The phone records of Fortson's co-defendants, as more particularly discussed above, show movement from Stone Mountain in the morning, to near Fortson's home around noon, to the scenes of Smith's robbery and Hagood's shooting in the early afternoon, back to the area of Fortson's home, and then to the area where Hagood's stolen phone was located at 3:10 p.m. A trier of fact could reasonably conclude that the evidence concerning Fortson's co-defendants' phones was consistent with Fortson's involvement in the crimes.

A trier of fact could also conclude that the men who robbed Smith participated in the crimes against Hagood about 40 minutes later, given the testimony that Smith's wallet and his mother's keys were taken from him and then found by police at the location of the shooting. A man wearing a dreadlocks hairstyle participated in both

16

crimes. James identified Bates in a photographic lineup as the man with "dreads" who went through Hagood's pockets. However, James admitted at trial that he was "troubled" when he identified Bates because the photograph of Bates did not show him wearing a dreadlocks hairstyle. According to Bates's cousin, Shy, she had never known Bates to wear a dreadlocks hairstyle. Of the photographs of the five defendants authenticated by the detective, only Fortson is shown with a full head of hair wearing what could be described as a dreadlocks hairstyle, while the other defendants were shown with close-cut hair. There was no testimony that any of the defendants with close-cut hair had previously worn dreadlocks. Based on all of the above, the jury was authorized to conclude that Fortson, and not Bates, was the person who James saw going through Hagood's pockets.

After Smith's phone was stolen, it was used to call the phones of Fortson's mother, Fortson's cousin, and Brewer, among others. Fortson argued to the jury that calls made by that phone to people connected to Fortson could be reasonably explained as attempts by

17

Jordan to connect with Fortson. However, according to Brewer's testimony, the only one of Fortson's co-defendants she knew was Southern.[12] A trier of fact could conclude that at least the call to Brewer was made by Fortson while in possession of the phone stolen from Smith.

We acknowledge that this is a close case based on circumstantial evidence, and that the testimony of some witnesses, if believed by the jury, was exculpatory. For example, Fortson's mother maintained that she was not at home, but was at a neighbor's house when she received the 12:05 p.m. call from Southern, and that she told Fortson about that call some unspecified time later. But in order for Fortson to have joined Southern and driven with him to Austell, where Smith was robbed, Fortson had to have left his home within a few minutes of the 12:05 p.m. call. Fortson's mother also testified that she received a call around 4:00 p.m. that day from someone looking for Fortson, but she told them

---

[12] Although Southern knew Brewer, Southern had his own phone, and Smith's stolen phone was used to call Southern's phone, among others. A trier of fact could conclude that it was unlikely that Southern used Smith's stolen phone to call Brewer.

that Fortson had left with his cousin. If that were the case, Fortson would not have been in possession of his mother's phone when it made the 3:53 p.m. phone call that "pinged" off the cell tower used by the phone stolen from Hagood. And James identified Bates, not Fortson, in a photographic lineup as the man who went through Hagood's pockets. However, it was for the jury to assess, among other issues, whether Fortson's mother's testimony was untruthful and whether James had recognized Bates's face but mistakenly identified him as the man with the dreadlocks who went through Hagood's pockets. See, e.g., *Davis v. State*, 306 Ga. 594, 597 (1) (832 SE2d 341) (2019). The evidence authorized the jury to conclude that the proved facts were consistent with Fortson's guilt and excluded every reasonable hypothesis other than Fortson's guilt. See OCGA § 24-14-6. See also *Carter v. State*, 305 Ga. 863, 867-868 (2) (828 SE2d 317) (2019) (circumstantial evidence implicating the appellant included location of the victim's phone after the victim's death); *Eckman v. State*, 274 Ga. 63, 64-66 (1) (548 SE2d 310) (2001) (circumstantial evidence supporting murder conviction included

19

appellant's use of "the fruits of the multi-county crime spree").

The State did not establish that Fortson personally shot Hagood, took Hagood's cell phone through the use of a handgun, or took Hagood's car by force and intimidation while in possession of a handgun. However, "[e]very person concerned in the commission of a crime is a party thereto and may be . . . convicted of commission of the crime." OCGA § 16-2-20 (a). A person is a party to a crime if that person "[d]irectly commits the crime; . . . [i]ntentionally aids or abets in the commission of the crime; or . . . [i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime." OCGA § 16-2-20 (b). "While mere presence at the scene of a crime is not sufficient evidence to convict one of being a party to a crime, criminal intent may be inferred from presence, companionship, and conduct before, during and after the offense." *Parks v. State*, 304 Ga. 313, 315-316 (1) (a) (818 SE2d 502) (2018) (citation and punctuation omitted). The jury could reasonably conclude that Fortson was present at the scene and went through Hagood's pockets, participated in the armed robbery of Smith

20

shortly before, and traveled to and from the scene with his co-defendants, and so shared in the criminal intent. See *Eckman*, 274 Ga. at 65-66 (1) (evidence showing that the appellant shared in the criminal intent included that she was willingly present at the scene when the victims were killed and had been involved in her companions' commission of crimes in the previous 24 hours). A rational trier of fact could have found beyond a reasonable doubt that Fortson was a party to the crimes of which he was convicted. See *Jackson*, 443 U.S. at 319 (III) (B).

2. Fortson contends that the trial court erred when it failed to grant his motion for new trial while sitting as the "thirteenth juror." OCGA §§ 5-5-20 and 5-5-21, respectively, allow the trial court to grant a new trial "[i]n any case when the verdict of the jury is found contrary to evidence and the principles of justice and equity," or when "the verdict may be decidedly and strongly against the weight of the evidence even though there may appear to be some slight evidence in favor of the finding." The two statutes give "the trial court broad discretion to sit as a thirteenth juror and weigh the

evidence on a motion for new trial alleging these general grounds."

*Holmes v. State*, 306 Ga. 524, 527-528 (2) (832 SE2d 392) (2019)

(citation and punctuation omitted).

In its order on Fortson's motion for new trial, the trial court stated that, having reviewed "the entire record," it "weighed the evidence and made determinations of credibility of witnesses as is its obligation under Georgia law in acting as the 'thirteenth juror.'" The trial court then found that "the jury's verdict is not contrary to the evidence or decidedly and strongly against the weight of the evidence, nor do the principles of justice and equity demand a new trial," and so denied the motion for new trial on the general grounds. The trial court having exercised its discretion as the "thirteenth juror,"[13] and this Court having concluded that the evidence was sufficient to support the verdicts under the constitutional standard,

---

[13] "[W]here, as in this case, the judge who hears the motion for a new trial is not the same judge as the one who presided over the original trial, the discretion of the successor judge is narrower in scope." *State v. Harris*, 292 Ga. 92, 95 (734 SE2d 357) (2012). Nevertheless, "after a thorough review of the case, even a successor judge may exercise a significant discretion to grant a new trial on the general grounds." *White v. State*, 293 Ga. 523, 525 (2) n.4 (753 SE2d 115) (2013).

we discern no abuse of discretion in the trial court's denial of the motion for new trial.  See *Smith v. State*, 300 Ga. 532, 534 (1) (796 SE2d 671) (2017).

3. Lastly, Fortson contends that the trial  court  committed reversible error when it denied his request for a directed verdict of acquittal.  "The standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of the evidence to support a conviction."  *Hester v. State*, 282 Ga. 239, 240 (2) (647 SE2d 60) (2007). We concluded in Division 1, above, that the evidence was sufficient to support Fortson's convictions.  The trial court did not err in denying Fortson's motion for a directed verdict.

*Judgment affirmed. All the Justices concur, except Colvin, J., who dissents, and Peterson, J., not participating.*

COLVIN, Justice, dissenting.

In affirming Fortson's convictions based upon circumstantial evidence, the majority opinion relies upon the deference we give to the jury's assessment of the evidence.  See *Worthen v. State*, 304

Ga. 862, 867 (3) (c) (823 SE2d 291) (2019) ("Jurors are normally entitled to make reasonable inferences from circumstantial evidence regarding all sorts of facts, including the facts necessary to find defendants guilty beyond a reasonable doubt of capital crimes."). However, even giving the jury's credibility determinations proper deference, the State is still required to prove that Fortson was a party to the crimes beyond a reasonable doubt. Because the circumstantial evidence in this case connecting Fortson to the crimes is insufficient to satisfy the beyond-a-reasonable-doubt standard and does not exclude every reasonable hypothesis save that of Fortson's guilt, I cannot agree with the majority's conclusion. Accordingly, I respectfully dissent.

The crux of this case is whether the limited circumstantial evidence presented by the State was sufficient to sustain Fortson's convictions for being a party to the crimes. See OCGA § 16-2-20 (defining "party to a crime"). To show that a person was a party to a crime, "[p]roof that the defendant shares a common criminal intent with the actual perpetrators is necessary." *Slaton v. State*, 296 Ga.

122, 124 (1) (765 SE2d 332) (2014) (citation and punctuation omitted). Although "shared criminal intent may be inferred from the defendant's conduct before, during, and after the crime," id. (citation and punctuation omitted), mere presence "is not sufficient to show that a defendant is a party to the crime under OCGA § 16-2-20. . . . Even approval of the act, not amounting to encouragement, will not suffice." *Bullard v. State*, 263 Ga. 682, 684 (1) (436 SE2d 647) (1993) (punctuation omitted). See also *Parks v. State*, 304 Ga. 313, 315-316 (1) (a) (818 SE2d 502) (2018) ("While mere presence at the scene of a crime is not sufficient evidence to convict one of being a party to a crime, criminal intent may be inferred from presence, companionship, and conduct before, during, and after the offense." (citation and punctuation omitted)).

Here, the circumstantial evidence that would allow a jury to infer that Fortson shared a common criminal intent with the known perpetrators is insufficient, and there is no direct evidence that Fortson was at either crime scene or that he possessed any of the stolen items. Unlike his co-defendants, no one identified Fortson as

25

being at either crime scene, none of the cell-phone evidence directly places him at or near either crime scene, and Fortson made no statements implicating himself in the crimes. In other words, the record, which shows no more than Fortson's friendship with his co-defendants, lacks sufficient evidence connecting Fortson to the crimes from which the jury could reasonably infer a common criminal intent. See *Mattox v. State*, 196 Ga. App. 64, 66 (3) (395 SE2d 288) (1990) ("[M]ere presence, association or suspicion, without any evidence to show further participation in the commission of the crime, is insufficient to authorize a conviction." (citation and punctuation omitted)). Furthermore, due to the weak circumstantial evidence in this case, the State failed to exclude Fortson's reasonable, alternative hypothesis that he did not participate in the crimes charged and that, instead, the men who committed the crimes were attempting to contact him before and after the crime spree. See OCGA § 24-14-6 ("To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, *but shall exclude every other*

26

*reasonable hypothesis save that of the guilt of the accused."* (emphasis supplied)).

Contrary to the majority's conclusion, the cell-phone evidence does not provide sufficient circumstantial evidence that Fortson was a party to any of the crimes charged. In my mind, the strongest circumstantial evidence introduced at trial was the cell-phone records from Smith's stolen phone. The State heavily relied upon these records in its attempt to establish Fortson's alleged motive for participating in the crimes — namely, that he was broke and needed money and a cell phone. The cell-phone evidence, however, does not support the State's theory. The record shows that the first calls placed on Smith's stolen phone were to Kiara Shy's phone — Jordan's girlfriend and Bates's cousin.[14] Prior to March 26, Shy's and Jordan's phones were in constant contact, calling and texting numerous times a day. However, after Smith's phone was stolen, the contact between Jordan's and Shy's phones diminished

---

[14] A review of Fortson's phone records shows no contact between Fortson and Shy at any time.

*significantly*, and, instead, Shy's phone began calling Smith's stolen phone numerous times a day. More importantly, Jordan's phone shows *no activity whatsoever* from 5:00 p.m. on March 27 through 10:24 a.m. on March 29.[15] Notably, the first phone call from Smith's stolen phone to Ms. Fortson was not placed until 6:42 p.m. on March 27, more than 24 hours after Smith's phone was stolen and over an hour-and-a-half after Jordan stopped using his phone completely.

The evidence also shows that Jordan's friend, Dionte Wooten, had the phone number for Smith's stolen phone saved in his contacts as "Tay Tay," which is Jordan's nickname. This corroborates the portion of Jordan's custodial statement wherein he admitted to having Smith's phone. Finally, the record shows that all of the phone calls to and from Smith's stolen phone pinged off towers in the area of Candler Road and I-20 where Jordan and Bates were staying. Based on the evidence, I disagree that a jury could reasonably infer beyond a reasonable doubt that, because Fortson

---

[15] A review of all of the cell-phone records shows that Jordan was the only co-defendant to stop using his phone at any point after the crimes.

was using Smith's stolen phone after the crimes were committed, Fortson was a party to Hagood's murder. See Maj. Op. at 211-212. Accordingly, I must also disagree that the State put forth sufficient evidence to exclude Fortson's reasonable alternate hypothesis that Jordan was using Smith's stolen cell phone after the crimes to contact people he knew, including Fortson.[16]

Regarding the evidence that Smith's stolen phone called Brewer, the phone records show that Brewer was contacted *once* from Smith's stolen phone, and that phone call took place on March 28 at 1:14 a.m., 36 hours after Smith's phone was stolen. The call also pinged a tower in the Candler Road/I-20 corridor, which was not in the area where Fortson lived with his mother. Meanwhile, the phone Fortson shared with his mother continued to call and text Brewer numerous times after the crimes were committed. Consequently, I cannot say it was reasonable for the jury to infer

---

[16] The record also shows that Southern's phone was in contact with the stolen phone for the same two days that Jordan's phone sat idle, but that Fortson's mother's phone continued to call and text Southern's phone. Consequently, I also disagree that the jury could have reasonably inferred that Fortson was using the stolen phone to call Southern.

that Fortson used the phone to call Brewer. However, even assuming that the jury could reasonably infer Fortson called Brewer (and his cousin) from the stolen phone, as the majority contends, these calls do not establish beyond a reasonable doubt that Fortson shared a common criminal intent with his co-defendants. Instead, these phone calls, at best, show mere knowledge of the crimes after the fact, and not that Fortson participated in or encouraged an armed robbery and murder.

I am not swayed that any of the remaining evidence could prove beyond a reasonable doubt that Fortson was a party to Hagood's murder or that the State excluded Fortson's reasonable alternative hypothesis that he was not a participant in the crimes. The majority relies on the potential location of Southern's cell phone at the time of the 12:05 call and the State's 29-minute timeline as sufficient to establish Fortson's involvement. However, Smith's own testimony, coupled with the cell-phone records, does not sufficiently establish that Southern picked up Fortson and drove him to the locations of Smith's armed robbery and to Hagood's murder.

30

Smith testified that there were *three to four men* involved in his armed robbery. The State corroborated this testimony with other evidence. Jordan, Southern, and Willis were placed at Smith's armed robbery by their phone records; Smith positively identified Southern as one of his assailants; Bates and Jordan admitted to being at both Smith's armed robbery and Hagood's murder; and, the jury heard evidence that Bates pled guilty to Smith's armed robbery in Cobb County and that Fortson was never charged. The State presented no evidence whatsoever that more than four men participated in Smith's armed robbery or that a second car was involved. Moreover, while the evidence shows that a second car was present at the scene of Hagood's murder, that car belonged to, and was driven by, Hagood.

The State's entire timeline concerning Fortson's alleged involvement in Hagood's murder revolved around Southern picking up Fortson after the 12:05 phone call and then driving to Austell where the group robbed Smith. However, because the evidence shows that *four men* were at Smith's armed robbery, it is

unreasonable for the jury to have inferred that Southern picked up Fortson, *a fifth person*, after the 12:05 phone call[17] and that Fortson was present at Smith's armed robbery and Hagood's murder, dreadlocks or not.[18]

The majority also relies on the 3:53 p.m. call "by Fortson's mother's phone [that] utilized the same cell tower used by Hagood's phone approximately 40 minutes earlier." Maj. Op. at 208. The record shows that the call was to Ms. Fortson's grandmother who lived in Ousley Court, a residential area less than one mile from the area where Hagood's car and phone were located. The State presented testimony that Ms. Fortson frequented Ousley Court because her grandmother lived there. The record further shows that Ms. Fortson's cell phone pinged off that cell tower twice in 40

---

[17] While the lead detective testified that, at the time of the 12:05 call, Southern's cell phone pinged off a cell tower that was 1.6 miles south of Fortson's home "as the crow flies," he later clarified that the tower itself was a 2.6-mile drive to Fortson's home.

[18] I agree with the majority that it was reasonable for the jury to infer that Fortson had dreadlocks on the date of Hagood's murder and that it was reasonable for the jury to infer that a man with dreadlocks participated in both crimes. However, based upon the weak circumstantial evidence in this case, I must disagree that the State sufficiently proved beyond a reasonable doubt that "the man with dreads" present at either crime scene was Fortson.

minutes before moving elsewhere, and that the cell phone pinged off a tower near the Fortsons' home on Bouldercrest Road at 6:09 p.m., approximately three hours before Smith's stolen cell phone was reset. In my mind, there are two reasonable inferences a jury could draw from this evidence. First, and more likely, Ms. Fortson was on the way to visit her grandmother when the 3:53 call was placed. Second, a jury could also infer that Fortson met up with Bates, Jordan, Southern, and Willis after his friends committed the crimes. I disagree with the majority, however, that this evidence creates a reasonable inference that Fortson participated in Hagood's murder. If anything, this evidence supports only a finding that Fortson knew that his friends had committed criminal acts after the fact. See *Bullard*, supra, 263 Ga. at 685 (1).

Based upon these considerations, I must conclude that the evidence as a whole was insufficient as a matter of law to support Fortson's convictions. Accordingly, I would reverse.

Decided February 15, 2022.

Murder. Fulton Superior Court. Before Judge Krause.

*Stanley W. Schoolcraft III*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Kevin C. Armstrong, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Leslie A. Coots, Assistant Attorney General*, for appellee.