NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 10, 2025

S25A0232.  DOUGLAS v. THE STATE.

LaGrua, Justice.

Jeremiah Douglas was convicted of murder and aggravated assault for pushing Leea Raines, his former girlfriend, out of the truck he was driving, killing her.[1] Douglas's sole defense at trial was

---

[1] Raines was killed on November 5, 2021. On September 8, 2022, a Dade County grand jury indicted Douglas for malice murder (Count 1), felony murder (Count 2), aggravated assault (Count 3), and two counts of making a false statement (Counts 4 and 5). Douglas was tried in October of 2022 and a jury found him guilty on all counts. The trial court sentenced Douglas to life without possibility of parole for malice murder (Count 1). Count 2 was vacated by operation of law. The trial court purportedly sentenced Douglas to 20 years for aggravated assault (Count 3), to run consecutively to Count 1. The trial court merged Count 5 into Count 4 for sentencing purposes, sentencing Douglas to an additional five years on Count 4, which, by amended order, purportedly ran consecutively to the sentence for aggravated assault (Count 3).

Douglas timely filed a motion for new trial which he subsequently amended through new counsel. On July 19, 2024, the trial court held a hearing on the motion and denied it by amended order on August 5, 2024. Douglas filed a timely notice of appeal on August 16, 2024, and his case was docketed to the term of this Court beginning in December 2024 and submitted for a decision on the briefs.

that Raines "committed suicide" by jumping out of the truck as she suffered from a narcotic withdrawal. Douglas contends on appeal that (1) the evidence was insufficient to support his convictions for malice murder[2] and aggravated assault, and, (2) Douglas's trial counsel was ineffective for failing to request a jury charge on the lesser offense of voluntary manslaughter. Although we conclude that the trial court committed a merger error, and thus vacate one conviction and remand for resentencing on another conviction, we otherwise affirm.

The evidence admitted at trial showed that Douglas and Raines met online in June 2021. Raines moved in with Douglas that July and died in November. The record reflects that Raines was addicted to drugs, including methamphetamine, heroin, and fentanyl.

---

[2] Douglas's felony murder conviction was vacated by operation of law, which moots any appeal as to that conviction. See *Fortson v. State*, 313 Ga. 203, 209 (1) n.11 (869 SE2d 432) (2022) (holding that "[a]ny challenge as to the sufficiency of evidence" relating to convictions that merged or were vacated by operation of law was moot) (citation omitted). Douglas does not appeal his convictions for making false statements.

On the night of November 4, 2021, Douglas took Raines "out" to play bingo "to celebrate her getting a new job." Raines spent the night at Douglas's house. Between about 1:58 a.m. and 3:31 a.m. on the morning of November 5, the record shows that Raines set up a Facebook page which she used to message three men, all of whom appeared to be romantic interests with whom Raines wanted to do drugs.

On the morning of November 5, a witness testified that she was driving near the local methadone clinic when she saw a "brown and tan looking older model pickup" truck, which Douglas admitted at trial he was driving that morning, in the oncoming lane, "kind of swerving" until it "got over in" her lane. The witness testified that she pulled over until the truck passed. She said that as the truck approached, "[i]t looked like the driver was trying to push the passenger out" while the passenger door was "all the way open," and the passenger was "[t]rying to pull the door back to." The witness said that the driver "was behind the wheel, but kind of scooted over a little bit . . . . [t]oward the passenger." The witness said that she

3

could see the driver's hand "pushing towards" the passenger, and that she saw that hand "mak[ing] contact with" and "pushing" the passenger's "upper arm." The witness said that she could see nothing further in her rearview mirror once the truck passed. She said that the truck never stopped or slowed down while she watched it, its speed remaining "[a]bout the same," which she estimated at about 50 miles per hour.

The witness drove to a nearby gas station and called 911, the first of two such calls. The calls were admitted into evidence and the State played them for the jury. In the first call, the jury heard the witness saying that the truck was "all over the road with the passenger door open. It looks like they're tryin[g] to push them out of the truck," and "you could see [th]em tryin[g] to push somebody out of the truck." The witness drove back to the scene, whereupon she called 911 the second time, and was recorded saying, "whoever was drivin[g the truck] has actually pushed them out of the vehicle, they're laying [sic] in the road."

A second witness testified that he was driving "past the treatment center" that morning when he saw a "maroon, two toned," "old Ford pickup truck" "coming around the curve" with its "[p]assenger's side" door "[a]ll the way" open. The witness said he saw the truck "swerve over into the opposite lane," with the door staying "wide open," until the witness drove "around the curve and lost sight." The witness testified that the truck "appeared to be speeding up" to around "60 [or] 70" miles per hour, and the witness never saw it slow down or stop. The witness did not see a passenger in the truck.

According to video surveillance footage, Douglas returned home and then left again roughly five minutes later. Evidence at trial showed that he drove to do handyman work at a house about thirty minutes away.[3] By then, law enforcement had responded to

---

[3] The house belonged to Ashvini Vardhana. Vardhana testified that Douglas arrived at her house around 9:30 a.m., and that nothing seemed "off about [Douglas's] conversation or personality," other than that he appeared "[p]reoccupied a little bit" and he worked "slow[ly]." [4] Medical Examiner Andrew Koopmeiners testified that Raines suffered subarachnoid and subdural hemorrhages caused by blunt impact to her brain; "numerous

the scene and found Raines lying in the roadway "obvious[ly]" deceased.[4] A dashcam in one of the vehicles of responding law enforcement captured a two-toned pickup truck driving past Raines's body. Within "[a]round two minutes" of the truck's passing Raines's body, Douglas initiated a text conversation with Raines's brother, Brandon Raines. Brandon's trial testimony, based on screenshots of the text chain which were admitted into evidence, showed the following interchange:

---

injuries" to her chest including three rib fractures; lacerations to her heart, diaphragm and liver; and damage to her lungs and aorta. He said that her "most significant" injuries were to her brain, which were "potentially fatal," and to her lacerated organs, "particularly the heart and the aorta," which would "bleed very rapidly and . . . are likely to be fatal as well," causing Raines to bleed to death within "probably minutes." Either the brain or heart injuries "independently could have contributed" to Raines's death. Dr. Koopmeiners testified that the cause of death was "multiple blunt force injuries . . . . consistent with someone exiting a vehicle at high speed going down a highway."

[4] Medical Examiner Andrew Koopmeiners testified that Raines suffered subarachnoid and subdural hemorrhages caused by blunt impact to her brain; "numerous injuries" to her chest including three rib fractures; lacerations to her heart, diaphragm and liver; and damage to her lungs and aorta. He said that her "most significant" injuries were to her brain, which were "potentially fatal," and to her lacerated organs, "particularly the heart and the aorta," which would "bleed very rapidly and . . . are likely to be fatal as well," causing Raines to bleed to death within "probably minutes." Either the brain or heart injuries "independently could have contributed" to Raines's death. Dr. Koopmeiners testified that the cause of death was "multiple blunt force injuries . . . . consistent with someone exiting a vehicle at high speed going down a highway."

DOUGLAS: [Raines] ran out on me last night. I don't know where she went. I went to bed, left her the phone and when I got up she was gone. She was literally supposed to start a job [at a local establishment] like Saturday . . . . but I love that chick. Why can't she just get it together? If you hear from her will you please let me know? And I'll do the same . . . .

BRANDON: I have no idea man. We've been wishing and praying for years . . . .

DOUGLAS: . . . [Last night] I took her out to bingo to celebrate her getting a new job. We played from like 6:30 to 10:30[. D]ude she [won a] $100 jackpot. She was so happy . . . . S**t $100 jackpot . . . . that's why she ran. She had $100 in her pocket and she was wanting to use [drugs,] and I wouldn't take her. I didn't even think about that. F**k this is all my fault. Look if you hear from her . . . tell her it's okay and that just come home[,] you know so she can still go to work[,] take care of her cousins[,] and that I do love her . . . .

BRANDON: I'll tell her if I talk to her man but it isn't your fault . . . .

DOUGLAS: You're right and I know you're right, but that doesn't make it any easier. If I just pay a little more attention. I just hope she's okay and makes it back before our first day of work[,] as messed up as that is . . . .

BRANDON: Hopefully we hear from her soon . . .

DOUGLAS: . . . I know[,] I'm worried. She's been clean for 20 days. I'm afraid she's going to OD . . . .

BRANDON: Lord I hope not.

Douglas continued driving to work, returning home later that day. Brandon testified that that evening around 8:00 p.m., Douglas called him and said, "they just found a body and they think it might just be your sister," at which point Douglas "started breaking down in tears."

Brandon testified that he had known Raines to "think about suicide" and that she had attempted suicide "[o]nce" before by overdosing on pain killers. He said that the prior attempt "pretty much scared [her] away to want to attempt again. It kind of gave her a new[-]found respect for her own life."

A post on Raines's Facebook account on October 2, 2021, stated that Raines "love[d] [her]self at least enough not to die on purpose[.]"

Surveillance video of the area from several sources, combined with evidence from the scene and witness interviews, allowed law enforcement to trace the truck to Douglas's stepfather, and from him to Douglas. At about 5:00 a.m. on November 6, the day after Raines died, GBI Agent Ghee Wilson went with a law enforcement team to

8

search Douglas's house, pursuant to a warrant. Agent Wilson interviewed Douglas as the team executed the search warrant. After Douglas waived his *Miranda*[5] rights, he told Agent Wilson that he had last seen Raines at 10:00 p.m. the night before she died, when Douglas went to bed. Douglas said that he woke the next morning at 8:00 a.m. and Raines "wasn't there." Douglas said that he "didn't know where she went," that he "didn't look for her," that he went "straight from the house" to the address where he was working for the day, and that he "didn't make any stops, didn't go anywhere." Douglas told Agent Wilson that he drove a "smaller silver Nissan car" to work. Agent Wilson testified that when he asked Douglas whether he had driven his stepfather's truck, Douglas "was adamant" that he had driven the Nissan and not the truck. Douglas told Agent Wilson that it had been "way more than seven days since [Douglas had] seen or sat in that truck." Later in the interview, Douglas said that "he had seen the truck, but he still had not been in that truck or sat in that truck in more than a week." Law

---

[5] *Miranda v. Arizona,* 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

enforcement took Douglas into custody after they finished searching the home.

A GBI toxicologist testified that Raines had methamphetamine in her blood when she died, but the toxicologist could not determine when Raines ingested the methamphetamine, how much she ingested, or whether Raines "would have been under the influence of or feeling the effects of" the methamphetamine the morning she died. The toxicologist could only say that "at some point" Raines had ingested methamphetamine.

A GBI crime-scene specialist testified that Raines rolled approximately 111 feet from the site of first impact to where her body lay in the road, and that the road rose about ten feet in that distance. He opined that "[i]f she was going that far uphill, the vehicle had to have been going fast." The specialist also testified that no tire marks were apparent at the scene, which he would have expected to see had Douglas tried to make a sudden stop.

Douglas testified in his own defense at trial. He indicated that he and Raines broke up and got back together "about five or six

times" in the few months leading up to Raines's death. After one breakup, Douglas texted someone that he was "not upset at all" with Raines, but that he felt "extreme hate" toward her, "like [he] hope[s] she ODs," and that he was glad it was over between them because "hate beats hurt." Douglas testified that he broke up with Raines for the last time at the end of September, which was about six weeks before she died. He testified that from that point on he preferred to be Raines's "friend with a chance of helping her [rather] than try to have a relationship with her . . . . She needed a friend, not a boyfriend."

Douglas testified that at approximately 9:00 a.m. on the morning that Raines died, he drove her in his stepfather's two-toned truck to "get a bank account set up" for her, which she needed for her new job. Their planned route took them past the nearby methadone clinic.

He said that as he and Raines were driving to the bank, Raines "looked straight ahead and just as calm as she could be she said [she couldn't] do this anymore, [she didn't] want to do this." He testified

11

that she said she "want[ed her] mom," who had previously died, and that "wanting her mom" meant to Douglas that Raines wanted to overdose. Douglas further testified that Raines was "three days off a detox," meaning that she had not been able to obtain drugs in that time, and "when she hits day three of detox that's when she becomes suicidal."

Douglas said that he "did a U-turn to head home." He testified that as they drove over an overpass, the guardrail of which was "right by her door," Raines said "f**k it, [she'll] just jump the rail. And she opened the door." Douglas testified that he said

> what the f**k are you doing, get back in the truck, you're going to kill yourself. We're going [30 to 35 miles per hour]. She screams no. So I don't know what. I can't stop. If I stop, she's going to jump the rail. So I did what I could . . . . I drifted the car over to hugging the . . . center line and I juked it. A juke meaning, like, towards [Raines] and mashed the gas. I used my own body weight to throw her back in the car. I brought her back in the car and the door closed and I hit the gas because if I stop, in my mind, she's either going to jump the rail or she's going to go OD. That home base is 90 seconds away at 70 miles an hour, a mile and a half, it's 90 seconds. If I can keep her in the truck for 90 seconds, we can be safe at home. I needed 90 seconds. We're passing [the methadone clinic] and she starts pushing on the door. She tries to wrench the door

12

open with her purse. It gets kicked back out. She tries to wedge the door open with her backpack. It gets out, then she just got the door open and left. She left. It's the same thing as falling out a seven-story window and I panicked. I panicked. I didn't know what to do.

Douglas said that he was also afraid to simply stop the truck because he had a prior conviction for statutory rape and child molestation. He said that meant that he would have been "arrested as a sex offender who just assaulted a woman in his truck," and Raines was "still going to go kill herself" and was "still going to go OD."

Douglas testified that he continued driving home after Raines allegedly jumped out because "that's where [they] were going. [He] was taking her home." He said he stayed at his house until he "got it together," and then drove back to where Raines lay on the highway to "pick her up" because he kept telling himself "she's fine." By then law enforcement had responded to the scene, and Douglas said that he knew that Raines was "dead because they ha[d] something covering her body." He testified that "[a]s soon as [he] saw that she was dead," he knew that he "had to tell [Brandon] something," but

Douglas "couldn't face the truth," so he sent Brandon the text messages referenced above. Douglas testified that it was a "mistake" to lie to Brandon about what happened. Douglas also said that he knew "immediately" that he would be arrested because Raines "killed herself directly in front of a methadone clinic that [he] took her to, where [he] had contact with a pack of cigarettes that [he] just handed her with [his] fingerprints on it." Douglas said that he then "checked out" because he was in "shock," and he "went on auto pilot."

Douglas said he went to work because his "first concern was getting [Raines's] funeral paid for and that [meant he] needed money." Douglas said that after he worked several hours, he went to his stepfather's house to pick up his own car, and then went home. He testified that he "spent intermittent times crying and just driving around[,] because [he] couldn't bear to be in the house for more than a half an hour[,] because [he] was surrounded by all of [Raines,] and [he] could not bear to look at [his] failure." He said that he also went outside to burn a "large pile" of "construction materials" and "extra

household garbage" he had stacked outside, because he "didn't want to leave trash in [his] yard for the next year while [he] was in jail." Douglas testified that he was "just trying to relax" as he waited for law enforcement to find him, because he was "pretty distraught." He said he eventually smoked marijuana "to the point [he] passed out," and "about an hour later" law enforcement came to his house. Douglas admitted on the stand that he lied to law enforcement when he told them that he had not seen Raines since the night before and when he said that he had not driven the truck in over a week.[6]

1. Douglas moved for directed verdict at the close of the State's evidence, arguing that the State's case was entirely circumstantial, and the evidence failed to exclude the reasonable hypothesis that Raines "committed suicide." On appeal, Douglas contends that the trial court abused its discretion by denying the motion pursuant to OCGA § 24-14-6. He also argues that the evidence was not sufficient

---

[6] These admissions are the basis for Douglas's convictions for making false statements to law enforcement, which Douglas does not challenge on appeal.

as a matter of constitutional due process to support his convictions.

His contentions fail for the reasons that follow:

OCGA § 17-9-1 (a) governs motions for directed verdict at trial. That statute provides:

> Where there is no conflict in the evidence and the evidence introduced with all reasonable deductions and inferences therefrom shall demand a verdict of acquittal or "not guilty" as to the entire offense or to some particular count or offense, the court may direct the verdict of acquittal to which the defendant is entitled under the evidence and may allow the trial to proceed only as to the counts or offenses remaining, if any.
> OCGA § 17-9-1 (a).

However, on appeal, our review of the trial court's denial of Douglas's motion for directed verdict "is not confined to the evidence presented up until the close of the State's case"; rather, we consider "the entire evidence," and "so long as all the evidence justifies the conviction under the appropriate standard, no error is shown by the denial of the motion for directed verdict." *Pittman v. State*, 300 Ga. 894, 897 (1) (799 SE2d 215) (2017) (citations and punctuation omitted).

(a) To the extent that Douglas challenges his convictions because the evidence was constitutionally insufficient, his argument fails. When we consider the sufficiency of the evidence as a matter of constitutional due process, we consider the evidence "in the light most favorable to the verdict," and we "evaluate whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Davenport v. State*, 309 Ga. 385, 388 (1) (846 SE2d 83) (2020) (citation omitted). In so doing, we "put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." Id. (citation and punctuation omitted).

A rational jury could have found beyond a reasonable doubt that Douglas murdered Raines and committed aggravated assault against her based on the evidence admitted at trial, including: (1) the eyewitness testimony that the driver of the truck was trying to push the passenger out; (2) Douglas's admission that he was the driver of the truck that morning; 3) Douglas's lies to Brandon and

17

law enforcement about what happened, which a jury could construe as evidence of consciousness of guilt, see *Sharkey v. State*, 320 Ga. 477, 481 (2) (910 SE2d 216) (2024) (concluding that a jury could construe text messages representing "an attempt to fabricate an alibi" and other lies as evidence of consciousness of guilt); and (4) Raines's statements on Facebook and to her brother that she did not want to die by suicide. Thus, while Douglas points to evidence, including his own testimony, from which the jury could have reached a contrary conclusion, the evidence was sufficient as a matter of constitutional due process for the jury to find him guilty of murder and aggravated assault. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). Therefore, "[i]t follows that the court did not err in denying [the appellant's] motion for directed verdict of acquittal made at the conclusion of the State's case-in-chief." *Pittman*, 300 Ga. at 897-898 (1) (citations and punctuation omitted).

(b) To the extent that Douglas challenges his convictions pursuant to OCGA § 24-14-6, his contention also fails. OCGA § 24-

14-6 says that "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." But this statute "only applies when the State's case against the defendant was wholly circumstantial." *Torres v. State*, 314 Ga. 838, 841 (1) (b) (878 SE2d 453) (2022) (citation and punctuation omitted). "If there is *any* direct evidence presented by the State, the circumstantial evidence statute does not apply in a sufficiency analysis." *Troutman v. State*, 320 Ga. 489, 492 (1) (910 SE2d 173) (2024) (citation and punctuation omitted) (emphasis added).

"Eyewitness testimony based on the witness's firsthand observations of the crime is direct, not circumstantial, evidence." *Bradley v. State*, 318 Ga. 142, 144 (1) (897 SE2d 428) (2024) (quoting *Gittens v. State*, 307 Ga. 841, 843 (1) n.2 (838 SE2d 888) (2020)). See also Ga. Pattern Jury Instructions (Criminal) § 1.30.20 ("'Direct evidence' is the testimony of a person who asserts that he or she has actual knowledge of a fact (such as an eyewitness) (such as by

19

personally observing or otherwise witnessing that fact).”); Evidence, Black's Law Dictionary (12th ed. 2024) (defining direct evidence as “[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption”).

An eyewitness here testified that “[i]t looked like the driver was trying to push the passenger out,”[7] and Douglas admitted at trial that he was the driver of the truck. These statements constitute direct evidence. Because there was direct evidence, “the circumstantial evidence statute does not apply,” *Troutman*, 320 Ga. at 492 (1) (citation and punctuation omitted), and Douglas's claim on this basis fails.

2. Douglas argues that his trial counsel rendered constitutionally ineffective assistance by pursuing an “all or nothing” defense that Raines's death was either murder or suicide,

---

[7] The fact that the witness observed the truck and its occupants for only moments while the truck was travelling at a fast speed goes to the weight of the evidence. Whether a reasonable juror may find this testimony unreliable is irrelevant to this inquiry: “direct evidence is not converted into circumstantial evidence by a witness['s] lack of credibility.” *Jackson v. State*, 310 Ga. 224, 228 (2) (b) (850 SE2d 131) (2020) (citation omitted).

instead of also requesting a jury charge on the lesser offense of voluntary manslaughter.[8] Douglas argues that a jury could infer that he pushed Raines out of the truck because he was jealous that Raines was seeing other men, resulting in an altercation in the truck that day, and that trial counsel should have pursued this alternative theory as well. This contention fails.

To prevail on a claim of ineffective assistance of counsel, Douglas must establish that (1) his attorney's performance was deficient and (2) that deficient performance prejudiced Douglas's defense. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984).

> To show that his lawyer's performance was deficient, [the appellant] must demonstrate that the lawyer performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. This is no easy showing, as the law recognizes a strong presumption that counsel performed reasonably, and [the appellant] bears the burden of overcoming this presumption. To carry this burden, he must show that no reasonable lawyer would have done

---

[8] A person commits voluntary manslaughter when he commits an act which would "otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person[.]" OCGA § 16-5-2 (a).

21

what his lawyer did, or would have failed to do what his lawyer did not. In particular, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

*Vasquez v. State*, 306 Ga. 216, 233 (3) (a) (830 SE2d 143) (2019) (citation omitted).

To show prejudice, Douglas must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694 (III) (B). If Douglas fails to satisfy either prong of *Strickland*, this Court need not examine the other prong. See *Jessie v. State*, 294 Ga. 375, 377 (2) (754 SE2d 46) (2014) (citation omitted). Douglas fails to show that his trial counsel's decision to pursue an "all or nothing" strategy that Raines's death was either the result of a suicide or murder, but not voluntary manslaughter, was deficient.

At the hearing on Douglas's motion for new trial, Douglas's trial counsel testified that Douglas did not "ever waver" from the assertion that Raines's death "was a suicide," which Douglas remained "adamant" about from the "first time [trial counsel] met him until the jury said their verdict," including when Douglas took the stand to testify at trial. Trial counsel further testified that he was "unified" with Douglas as to strategy because, while there was "slight evidence" of voluntary manslaughter, trial counsel did not think it was enough to satisfy "the voluntary manslaughter definition of incite[ment] of passion," such that trial counsel "just did not think that it was a path forward that [they] could go in this particular case." Trial counsel felt that the best defense was "an all or nothing thing . . . . it was either going to be a suicide or murder." Trial counsel also said that Douglas's trial testimony "did not go well," and "anything that drew any attention to what [Douglas] said . . . was going to be bad, whether it was consistent with what he said or inconsistent."

"Decisions about which defenses to present and which jury charges to request are classic matters of trial strategy, and pursuit of an all-or-nothing defense is generally a permissible strategy." *Velasco v. State*, 306 Ga. 888, 893 (3) (b) (834 SE2d 21) (2019) (citation omitted). We conclude that trial counsel was not deficient in pursuing the sole defense that Raines's death was a result of suicide and, consequently, choosing not to request a jury charge on voluntary manslaughter. Douglas consistently maintained that Raines "killed herself" and that he was not jealous of Raines, and so testified at trial. Moreover, Douglas points to no evidence that he had been "seriously provoked" at the time of Raines's death, and Douglas's defense that Raines "killed herself" was inconsistent with voluntary manslaughter. *Vann v. State*, 311 Ga. 301, 305 (2) (857 SE2d 677) (2021) (concluding no deficiency for failing to pursue a defense of voluntary manslaughter in a murder case where counsel could have reasonably concluded that the defense "was either unavailable or weak because the evidence did not show, or only questionably showed, that [the appellant] had been seriously

24

provoked," and voluntary manslaughter would have been "inconsistent" with the appellant's defense) (citations omitted). See also *Velasco*, 306 Ga. at 893 (3) (b) (concluding no deficiency for failing to request a charge on voluntary manslaughter in a murder case where the appellant maintained his sole defense at all times, including in his trial testimony, "particularly in light of the lack of evidence supporting a voluntary manslaughter charge[,] and the general inconsistency between" the appellant's sole defense and voluntary manslaughter) (citation omitted). Thus, trial counsel was not professionally deficient by choosing to forgo the defense of voluntary manslaughter in pursuit of the sole defense that Raines's death was a result of suicide. See *Vann v. State*, supra; *Velasco v. State*, supra.

3. Finally, although Douglas does not raise the issue on appeal, the trial court erred when it convicted Douglas of both malice murder and aggravated assault of Raines, instead of merging the latter into the former. "Even when no party raises a merger error, if we note such an error, we have the discretion to correct it on direct

25

appeal." *Dixon v. State*, 302 Ga. 691, 696 (4) (808 SE2d 696) (2017) (citation omitted).

> OCGA § 16-1-7 (a) affords a defendant with substantive double jeopardy protection by prohibiting multiple convictions and punishments for the same offense. OCGA § 16-1-7 (a) (1) prohibits a defendant from being convicted of more than one crime if one crime is included in another, and aggravated assault is included in the crime of malice murder when the former is established by proof of the same or less than all the facts[.]

*Johnson v. State*, 300 Ga. 665, 666 (2) (797 SE2d 903) (2017) (citations and punctuation omitted).

Douglas was convicted of malice murder for pushing Raines out of a moving truck with malice aforethought, and of aggravated assault for pushing Raines out of said moving truck. Because the aggravated assault conviction was established by the same facts as the malice murder conviction, except that the malice murder conviction also required proof of malice aforethought, the aggravated assault conviction was included in the malice murder conviction and merged into it. See *Smith v. State*, 301 Ga. 79, 80-81 (2) (799 SE2d 762) (2017) (concluding that an aggravated assault

conviction premised on a shooting with a rifle merged into a malice murder conviction for the same shooting) (citation and punctuation omitted); *Culpepper v. State*, 289 Ga. 736, 738-739 (2) (a) (715 SE2d 155) (2011) (concluding that an aggravated assault conviction premised on a stabbing with a knife merged into a malice murder conviction premised on the same stabbing) (citation omitted). As such, we hereby vacate Douglas's conviction and sentence for aggravated assault.

Also, the trial court sentenced Douglas to serve five years for making a false statement (Count 4),[9] purportedly to run consecutively to the aggravated assault sentence (Count 3). Because we are vacating the aggravated assault conviction, the sentence on Count 4 cannot run consecutively to the sentence for that aggravated assault. As such, we hereby vacate the sentence

---

[9] The trial court merged Count 5 into Count 4 for sentencing purposes at the State's request. We render no opinion on the propriety of that merger because the State does not raise the issue on cross-appeal, and any merger error benefitted Douglas. See *Dixon*, 302 Ga. at 696-697 (4) (explaining that this Court "[m]ost commonly" exercises its discretion to correct unraised merger errors which harm a defendant).

27

pertaining to Count 4, and remand for the trial court to resentence Douglas on that count. See *Ellington v. State*, 314 Ga. 335, 346 (4) (877 SE2d 221) (2022) (remanding for resentencing because the sentence for a vacated conviction would have run consecutively with two other sentences) (citation omitted).

*Judgment affirmed in part and vacated in part, and case remanded for resentencing. Peterson, CJ, and Bethel, Ellington, McMillian, Colvin, and Pinson, JJ, concur. Warren, PJ, concurs in judgment only in Division 1 (b).*